379 So.2d 387 (1980)
ALLAPATTAH COMMUNITY ASSOCIATION, INC. OF FLORIDA, a Non-Profit Corporation, and Martin Spellman and Patricia Spellman, His Wife, Residents and Taxpayers of the City of Miami, Appellants,
v.
CITY OF MIAMI, Florida, a Municipal Corporation, Appellee.
No. 79-1190.
District Court of Appeal of Florida, Third District.
January 8, 1980.
*388 John Lazarus, Miami, Legal Services of Greater Miami, for appellants.
George F. Knox, Jr., City Atty., and G. Miriam Maer, Asst. City Atty., for appellee.
Before HAVERFIELD, C.J., and SCHWARTZ and NESBITT, JJ.
SCHWARTZ, Judge.
Notwithstanding the strong recommendation of its planning department and a 4-1 decision of the Planning Advisory Board to the contrary, and over the vigorous objections of the vast majority of the residents of the affected area, the City of Miami Commission changed the zoning of a portion of the Allapattah community from residential (R-3, R-4) to commercial (C-5) usage. We find that the rezoning was not based upon any factually supported or legally cognizable ground which could serve to justify that action and was therefore not "fairly debatable." Since the court below held otherwise, we reverse the judgment under review.
The property which was the subject of the rezoning is located on the north side of N.W. 23rd Street between 17th and 25th Avenues, to a depth of 175 feet. It is indicated by the cross-hatching on the map which is reproduced below:
*389 
*390 In keeping with the existing R-3 and R-4 zoning (low and medium multiple residential use, respectively), the north side of N.W. 23rd Street is now overwhelmingly residential in character. In addition to many private homes, a HUD public housing development and a high school, among other structures, face directly on the street. On the other hand, the south side of the street, which forms a part of what is known as the Allapattah Industrial area, is zoned C-5 (liberal commercial). Consistent with that classification, it is almost entirely commercial and contains warehouses, automobile repair facilities and the like. To the south of this area, I-1 (light industrial) zoning extends to N.W. 20th Street.
One of the commercial establishments on the south side of 23rd Street is a large meat packing plant operated by Northwestern Meat, Inc. In late 1977, that company, desiring to expand its operation, applied to the Miami Zoning Board for the rezoning of four lots on the north side of 23rd, across the street from its plant. The Zoning Board denied the application on the stated ground that such a change would result in undesirable "spot zoning" of the area. Northwestern then appealed to the Commission, which requested the professional staff of the city's planning department to undertake a "broader study of the area" and to make recommendations accordingly. During this period, the time limitation for the presentation of Northwestern's "appeal" from the Zoning Board expired, and the Commission therefore took no formal or final action upon it.
Under the city code, Northwestern's request for a rezoning of the four lots in question could not have been renewed for one year. The Commission, however, submitted to the city's Planning Advisory Board[1] a proposal to rezone to C-5 the entire strip of the residential property on the north side of N.W. 23rd Street  of course including the four lots with which Northwestern was concerned. It was this proposal which was eventually adopted and which is now before us.
Pursuant to the commission's request, the Planning Advisory Board held an extensive hearing, the transcript of which has been made a part of the record on appeal. Several residents of the area appeared, including one of the present appellants, Mrs. Patricia Spellman, who owns a home in the strip in question at the corner of 23rd Street and 24th Avenue. Many of them had lived in the area, one of Miami's oldest and most traditional residential neighborhoods, for periods ranging from 10 to 30 years. With perhaps one exception, all expressed both their desire to continue to reside in the area as it was, and their concern that commercial zoning would severely harm, if not destroy its still-viable residential nature.[2] No residents of the area north of 23rd Street, either before the Board or, later, before the Commission, ever expressed any dissatisfaction with the neighborhood whether because of the traffic on 23rd Street or for any other reason. They wished only to preserve its character and therefore, virtually unanimously, were in opposition to the proposed rezoning.
At both the Planning Board and the Commission hearings, the Planning Department presented the results of the study requested by the Commission. Its professional recommendation was unreservedly against the proposal. Its conclusions were stated as follows:
There is no justification for the rezoning of the residential area along the north side of NW 23rd Street between 17th and 27th Avenues. The basis for this recommendation is as follows:

*391 Comprehensively, there is no justification for additional commercial zoning, due to the fact that ample properly zoned land (I-1) exists in near proximity to the subject area which is vacant or underutilized (presently occupied with low density residential wood structures in various states of disrepair). As indicated on the attached map titled `Allapattah Industrial Area,' and as reported by the Miami Comprehensive Neighborhood Plan studies, sufficient land is available, based on recent trends, to accommodate commercial and industrial expansion in this area for the next 12 to 15 years.
Any change to commercial zoning would not be consistent with the existing established land use pattern of the area.
The proposed change would not be in accord with the proposed Miami Comprehensive Neighborhood Plan which recommends low-moderate density residential land use for the north side of 23rd Street.
If zoning changes occur the impact on the abutting residential development would be greater than the impact upon the existing residential development facing the existing commercial development. Close proximity of commercial development (10' rear setback) could affect the quality of life more than facing commercial uses due to the street's spatial quality, and scheduled landscaping and buffering improvement.
The encroachment of additional commercial activity into the residential area could have a negative impact with respect to the stability of the residential area to the north. Efforts such as the `Comprehensive Neighborhood Rehabilitation Program' which promotes investments and interest in existing housing stock could likewise be adversely impacted.
A change as proposed would increase auto and truck traffic on 23rd Street and could introduce additional commercial traffic into the residential area between 23rd and 28th Streets.[3]
After the Planning Board voted 4-1 to recommend that the proposal be rejected, the City Commission proceeded to consider the rezoning at its meeting of September 28, 1978. As they had before the Planning Board, the planning department and representatives of the residents presented their opposition. As at the Advisory Board level, three types of argument were presented on the other side:
(a) A non-resident of the area, who happened to be the architect for Northwestern Meat, stated his opinion that the commercial traffic on N.W. 23rd Street was too heavy, too dangerous, and incompatible with the residential character of the north side of the street.
(b) Several persons, all non-residents of the area, and three of whom were associated with Northwestern Meat, stated their conclusion that the area should be rezoned so as to attract new business and industry to the city.

*392 (c) Statements were made by various persons at the meeting, notably including the attorney for Northwestern Meat and the city commissioner who moved for the adoption of the ordinance, that it was "poor planning" to permit a street to serve as a dividing line and buffer zone between two zoning districts.
At the conclusion of its meeting, the commission voted 3-2 to adopt the proposal by enacting ordinance No. 8862, which provided as follows:
WHEREAS, the City Commission, notwithstanding the recommendation of denial by the Miami Planning Advisory Board, and after careful consideration and due deliberation of this matter, deems it advisable and in the best interests of the City of Miami and its inhabitants to amend said Ordinance as hereinafter set forth;
NOW, THEREFORE, BE IT ORDAINED BY THE COMMISSION OF THE CITY OF MIAMI, FLORIDA:
Section 1. Ordinance No. 6871, the Comprehensive Zoning Ordinance for the City of Miami be, and the same is hereby amended by changing the zoning classification of the north side of N.W. 23rd Street generally to a depth of 175', from 364.5' west of N.W. 17th Avenue to N.W. 25th Avenue, from R-3 (Low Density Multiple) and R-4 (Medium Density Multiple) to C-5 (Liberal Commercial); . .
The Allapattah Community Association, Inc., and Martin and Patricia Spellman sought review of the ordinance in the Dade County Circuit Court.[4] The appellate division of the lower court affirmed on the simple statement that it found the measure to be "fairly debatable." The Spellmans and the Association then took certiorari, which we have treated as an appeal,[5] to review the Circuit Court decision.
It is axiomatic that no zoning regulation may be sustained unless it bears a substantial relation to the public health, safety, morals, or welfare. E.g., City of Miami Beach v. Lachman, 71 So.2d 148 (Fla. 1953); Town of Belleair v. Moran, 244 So.2d 532 (Fla. 2d DCA 1971) and cases cited. It is required that those who, like the appellants in this case, seek to set aside a particular zoning decision clearly demonstrate that it is not even "fairly debatable" that no such relationship exists. City of St. Petersburg v. Aikin, 217 So.2d 315 (Fla. 1968). That heavy burden has been successfully carried here.
We start by stating the rule that those who own property and live in a residential area have a legitimate and protectable interest in the preservation of the character of their neighborhood which may not be infringed by an unreasonable or arbitrary act of their government. See City of Miami v. Zorovich, 195 So.2d 31, 37 (Fla. 3d DCA 1967), cert. denied, 201 So.2d 554 (Fla. 1967), and cases cited.[6] As the court stated in Watson v. Mayflower Property, Inc., 223 So.2d 368, 373 (Fla. 4th DCA 1969), cert. discharged, 233 So.2d 390 (Fla. 1970):
It is self-evident that the general welfare of a community demands that in some part or parts of its land area citizens may develop their homes without fear of losing a substantial segment of their economic investment or the comfort and enjoyment *393 of their homes by the encroachment of commercial developments.
The record, read in the light of the applicable law, provides not even an arguable basis for the severe compromise of the residential character of the area north of 23rd Street effected by the ordinance under review. None of the grounds asserted by the city for the contrary contention that the ordinance is related to the public health, safety and welfare has merit, or, as this court put it in Dade County v. Beauchamp, 348 So.2d 53, 55 (Fla. 3d DCA 1977), cert. denied, 355 So.2d 512 (Fla. 1978), "makes sense:"
(1) There is nothing whatever to the claim that the rezoning is necessary to safeguard the neighborhood from the dangers of heavy traffic on 23rd Street. Compare, e.g. Watson v. Mayflower Property, Inc., supra. The only portion of the record which might support this conclusion, is the suspiciously altruistic statement of Northwestern's architect concerning a condition of which those supposedly affected did not themselves complain. His opinion, however, was a mere non-expert conclusion which is therefore devoid of any evidentiary value whatever. See Katz v. Dade County, 367 So.2d 277, 279 (Fla. 3d DCA 1979), cf. South Central Association of Neighbors, Inc. v. Lindsey, 21 Or. App. 578, 535 P.2d 1381 (1975). This is particularly the case when the only competent evidence in the record  the expert opinion of the planning department based upon a Dade County Traffic Department survey  is completely to the contrary. The planning department's representative before the Commission, Mr. Whipple, characterized the traffic on 23rd St. as "minimal;" its report states both that N.W. 23rd is considered to be "a local service street with light traffic," and that traffic problems would come into existence only if the proposed rezoning is accomplished. It is thus to stand reality on its head to attempt to justify the action taken by the commission by asserting that it will serve to alleviate an existing traffic hazard.
(2) The statements in the record that the rezoning is needed to promote the commercial development of the city are similarly subjective and conclusory, and thus similarly valueless. See Katz v. Dade County, supra; South Central Association of Neighbors, Inc. v. Lindsey, supra. Once again, the planning department found, on the basis of its objective survey, that "ample properly zoned land exists in near proximity to the subject area which is vacant or underutilized ... [S]ufficient land is available, based on recent trends, to accommodate commercial and industrial expansion in this area for the next 12 to 15 years." Thus, it clearly appears that any paucity of commercial or industrial enterprises in the area has nothing at all to do with an insufficiency of appropriate zoning. The following statement in Kennedy v. City of Evanston, 348 Ill. 426, 181 N.E. 312, 314 (1932), which invalidated a zoning amendment permitting apartments in a formerly single-family neighborhood, is entirely apropos:
No showing has been made why the vacant and poorly improved land in the B use district cannot be used for apartment houses before it is necessary to encroach on the A territory. At the rate at which apartment buildings have been erected in the B territory south of Keeney street since 1921, there are enough vacant lots to take care of the growth for many years. Appellants, at the time they bought their homes, had a right to rely upon the classification of the property in question which then existed and upon the rule of law that the classification would not be changed unless the change was required for the public good.[7]
(3) Lastly, both the law and common sense entirely disprove the suggestion that it is somehow improper for N.W. 23rd Street to serve as the divider between the residential zone on the north and the commercial area to the south. Because, as the courts have repeatedly said, boundary lines between zoning districts necessarily have to be placed somewhere, it is not only not *394 "poor planning," it is entirely appropriate for the divider to be a street. See City of Miami Beach v. Wiesen, 86 So.2d 442 (Fla. 1956); Dade County v. Miller, 325 So.2d 418 (Fla. 3d DCA 1976); Town of Surfside v. Skyline Terrace Corp., 120 So.2d 20 (Fla. 3d DCA 1960), cert. denied, 123 So.2d 675 (Fla. 1960). The fallacy underlying the city's contention on this issue is best illustrated by the effect of the very ordinance in question, which is a classic case of the prescribed cure being far worse than the supposed disease. Instead of the entire width of N.W. 23rd Street acting as a buffer for the zone, commercial usage has been permitted to intrude directly into the residential area itself, with only a 10' set back requirement intervening between the commercial development and the still-existing R-3, R-4 zoning to the north of the dezoned strip. Since, under the city's reasoning, this is all-the-more-obviously insufficient, there would be no basis for resisting future inroads into the block north of 23rd Street until 24th Street became the dividing line  and then crossing that street on the same theory asserted to support the present action. Thus, the entire Allapattah residential community  and, for that matter, every residential area in the city  would be defenseless against the advance of commercial or industrial development imposed merely by the fiat of the commission. As our supreme court wisely observed may years ago in City of Miami Beach v. Ocean & Inland Co., 147 Fla. 480, 3 So.2d 364, 366 (1941);
At the juncture of these streets property which may be devoted to business abruptly ends and that which may be used for hotels and apartments as suddenly begins but there must be a line of demarcation between them somewhere. See State ex rel. Townsend v. Farrey, 133 Fla. 15, 182 So. 448; Zahn v. Board of Public Works, 195 Cal. 497, 234 P. 388. The fact that his land is situated across the street from that on which commercial enterprises may be operated was not alone enough to support plaintiff's position that he should be given the same latitude in the use of his property. Were this the case it would be but a matter of time before alterations of the whole scheme by successively liberalizing the use of abutting property would result in disintegration and disappearance of the whole plan of zoning. [e.s.]
We reject, therefore, the idea that an appropriate way to correct supposedly improper planning is to make it worse.
Thus, there is nothing of a competent, substantial nature to contradict or impeach the conclusive showing made by the planning department, by the contents of the proposed Comprehensive Development Plan, and by the present appellants and those they represent, that Ordinance No. 8862 is not reasonably related to the public welfare. Dugan v. City of Jacksonville, 343 So.2d 103 (Fla. 1st DCA 1977); Rural New Town, Inc. v. Palm Beach County, 315 So.2d 478, 479 (Fla. 4th DCA 1975); South Central Association of Neighbors, Inc. v. Lindsey, supra; compare Miles v. Dade County, 260 So.2d 553 (Fla. 3d DCA 1972). Rather, an analysis of the record reveals that, the window dressing aside, the only and real reason for the rezoning was that Northwestern Meat wanted to use the north side of 23rd Street for commercial purposes,[8] and a majority of the Commission wished to grant it that right. The law, however, will not and cannot approve a zoning regulation  or any governmental action adversely affecting the rights of others  which is based on no more than the fact that those who support it have the power to work their will. As the Supreme Court of Illinois stated in Kennedy v. City of Evanston, supra, at 181 N.E. 314-315:

*395 Appellee insists that the fact that a majority of the property owners in and adjoining the district in question want the change is proof of the changing condition of the territory. The power to amend is not arbitrary. It cannot be exercised merely because certain individuals want it done or think it ought to be done. The change must be necessary for the public good.

Appellee contends that the zoning commission was in error in the classifications of 1921 and 1927, and that the purpose of the statute is to enable the amendment of zoning classifications not only to take care of readjustments called for by the changing character of neighborhoods, but also to remedy particular errors or hardships. The evidence does not show that the zoning commission and the city council were in error in the original classification. The action of the zoning commission in recommending the amendment in the fall of 1928 after having denied a similar petition earlier in the same year might be attributed to the fact that certain property owners agreed to the widening and paving of the streets provided the reclassification was made. These agreements not only fail to show that the amendments to the ordinance were passed for the public good, but they tend to show that they were passed in deference to the wishes of certain individuals. The ordinance of 1929 cannot be sustained under the law and the evidence, ... [e.s.]
See also South Central Association of Neighbors, Inc. v. Lindsey, supra; Davis v. Nolte, 231 S.W.2d 471 (Tex.Civ.App. 1950).
Finding, for these reasons, that the zoning enactment challenged in this proceeding bears no reasonable relation to the health, safety, morals or welfare of the public, and that it is therefore arbitrary and unreasonable,[9] we reverse the judgment under review and remand the cause with directions that City of Miami Ordinance No. 8862 be quashed.
Reversed and remanded.
NOTES
[1] Under the scheme established in the code, the Zoning Board considers applications for variances or changes in zoning as to particular parcels, such as that embodied in Northwestern's initial request; while the Planning Advisory Board is concerned with proposals which deal with the planning and zoning of larger areas, like the commission's suggestion that the entire strip on the north side of 23rd street be rezoned.
[2] Many of the residents who were elderly, and on fixed incomes, expressed the now-familiar concern that real estate taxes would rise because of the increased value caused by the commercial zoning and that they would therefore be forced to move from their homes.
[3] The department noted, among other things, that a large amount of money had been expended specifically to safeguard the residential nature of the north side of 23rd Street. Its report stated:

The third year Community Development Program has allocated $250,000 for street repair, construction of curb, gutter and sidewalks where needed, and landscaping of NW 23rd Street, between 17th and 27th Avenues. This activity is but a small part of the total Community Development effort in the Allapattah area. During the first three years of Community Development funding, allocations were made to improve all the edges of this neighborhood including NW 23rd Street. The two main reasons for the beautification and improvement of NW 23rd Street are to protect and encourage the confinement of the residential neighborhood by creating a buffer zone between the liberal commercial and residential development through landscaping and improved parking facilities. The other objective is to improve the visual character of the street through the channelization of traffic movements, defining of parking and access points and landscape screening and beautification in front of existing development.
[4] The city did not raise the issue of standing either in the Circuit Court or in this one. It might be observed, however, that, although the status of the Community Association is at least doubtful, there can be no question of the standing of the Spellmans, who own property within the very area which was rezoned over their objection, to challenge that action. See Hemisphere Equity Realty Co., Inc. v. Key Biscayne Property Taxpayers Ass'n, 369 So.2d 996, 1001 (Fla. 3d DCA 1979). There is thus no obstacle to our consideration of the case on its merits.
[5] See United Teachers of Dade v. Save Brickell Avenue, Inc., 378 So.2d 296 (Fla. 3d DCA 1979).
[6] While almost all of the cases which speak of this interest deal with the "usual" situation in which a governmental unit resists, in the name of neighborhood integrity, an attempt to liberalize the zoning of residential property, the principle is equally applicable when, in the converse situation presented here, a city seeks to justify an encroachment of its own upon the existing nature of the area in question.
[7] The term "required for the public good" appears to be equivalent to the Florida test of relationship to the public health, safety and welfare.
[8] Northwestern Meat actually owns property, presently zoned I-1 and C-5, south of its existing facility. Its president stated, however, that, because it was easier to cross 23rd St. to the north than the railroad tracks to the south, it was more convenient to expand his business into the residential area. Thus, the rezoning was not even required, but was merely preferred, by the private entity to which it was granted. But see South Central Association of Neighbors, Inc. v. Lindsey, supra.
[9] There is a further reason why the ordinance should not be upheld. It seems clear that the Zoning Board was correct in rejecting Northwestern's original application for the commercial use of four lots on the north side of 23rd Street as impermissible "spot zoning" in the residential area. E.g., Parking Facilities, Inc. v. City of Miami Beach, 88 So.2d 141 (Fla. 1956); County of Brevard v. Woodham, 223 So.2d 344 (Fla. 4th DCA 1969), cert. denied, 229 So.2d 872 (Fla. 1969); 7 Fla.Jur.2d Building, Zoning, and Land Controls § 110 (1978). Plainly an action which purports to obviate this problem by changing the zoning of the entire area cannot be upheld. If it is improper to create a spot in a neighborhood, it is even more plainly unacceptable entirely to obliterate it.