502 So.2d 931 (1987)
SOUTHWEST RANCHES HOMEOWNERS ASSOCIATION, INC., a Florida Corporation, Appellant/Cross Appellee,
v.
COUNTY OF BROWARD, a Political Subdivision of the State of Florida, Appellee/Cross Appellant.
No. 4-86-0208.
District Court of Appeal of Florida, Fourth District.
January 14, 1987.
Rehearing and Clarification Denied March 9, 1987.
*933 Brion Blackwelder of Titone, Roarke, Blackwelder and Titone, Lauderhill, for appellant/cross appellee.
Susan F. Delegal, Gen. Counsel, and Annette Star Lustgarten, Asst. Gen. Counsel, Fort Lauderdale, for appellee/cross appellant.
ANSTEAD, Judge.
This is an appeal from a final judgment declaring valid two zoning ordinances enacted by Broward County in order to facilitate the location of a sanitary landfill and resource recovery plant in an unincorporated area of the County. We affirm.
In 1981, Broward County began to search for an appropriate location, and secure necessary zoning, for a large scale sanitary landfill and resource recovery plant. After a long period of search and negotiations including the consideration of some 100 prospective sites, the County settled upon a 588 acre parcel of land adjacent to the Broward Correctional Institution (BCI), a women's prison located in an unincorporated portion of agricultural southwest Broward County. It was determined that two land use code changes would be necessary to locate the project on that site. First, an application would be required to change the BCI site from a limited agricultural A-1 zoning district, which permits a variety of agricultural, low intensity uses but prohibits dumps, sanitary fill or incinerators, to an agricultural-disposal A-6 zoning district, which permits sanitary fill and incinerators. Second, in order to permit the large scale solid waste disposal facility contemplated, the text of the A-6 district provision needed to be changed to allow landfill up to 125 feet above ground level, to provide for a resource recovery facility, to allow structures to be 200 feet high, and to permit incineration on an area of 20 acres or less. These changes were accomplished by enactment of Ordinances 84-35(Z) and 84-87, the ordinances declared valid below.
The Southwest Ranches Homeowners Association, Inc. sought to enjoin the County from locating the project on the BCI site, claiming that the project would endanger the water supply and that the rezoning constituted improper spot zoning and conflicted with the Broward County land use plan. At trial, the Association called several expert witnesses. The substance of their testimony was that the BCI site is a wetland area which rests on the Biscayne Aquifer, a source of drinking water for the inmates and staff of the prison, as well as the property owners comprising the plaintiff Association. According to these witnesses, the proposed plant poses a threat to groundwater control, i.e., flooding, and may cause groundwater pollution which in turn poses a health threat to drinking water. Specifically, one witness testified that the proximity of the high water table to the base of the landfill in a wetlands area creates a risk that the membrane of the landfill lining will rupture, releasing pollutants called leachates into the surrounding environment. The appellant also presented the testimony of an urban planner to the effect that the proposed use is incompatible with the general agricultural character of the region, and inconsistent with several other elements of the Broward County Comprehensive Plan. In particular, the Association attempted to demonstrate that the proposed use was inconsistent with the coastal zone protection conservation element, the potable water element, and the solid waste element of the plan. Finally, the Association presented evidence that this same site had previously been rejected as a location for an industrial and office use, in light of existing land use policy to keep development in the area to a minimum.
*934 The County presented evidence which controverted the claims of the Association in virtually every material regard. The County put on evidence demonstrating the critical need for the facility and the lengthy search for a suitable site. With respect to the environmental concerns raised by the Association, the County presented the testimony of several experts who were associated with the project and possessed expertise in the fields of hydrology and solid waste disposal. These witnesses testified in detail as to the state-of-the-art safety and engineering standards incorporated into the landfill project and the numerous features of the system designed to address the problems of surface water management and groundwater pollution. They also described numerous monitoring devices and procedures designed to immediately detect any problems of water pollution. The gist of their testimony was that the project would create no problems of water pollution or flooding. In response to the Association's evidence that the project would be inconsistent with certain elements of the comprehensive plan, the County contended that the facility was consistent with the land use elements of the plan and also consistent with the overall objective of the plan to provide an adequate level of services to support future growth in the County without endangering environmental resources. The project was described as providing for a 40 acre park, initially, with the landfill itself to have a 20 year life during the course of which it would be converted entirely into a public park. A County planning official also testified that pursuant to the County Code, the petition for rezoning had been reviewed and approved for consistency with the comprehensive plan by all of the County agencies with expertise in their respective fields, such as pollution and drainage control. It was also demonstrated that the project was subject to the scrutiny and approval of numerous other federal, state and local governmental entities concerned with water pollution and flood control.
The court concluded in its final order (1) that the Association had not proven any inherent danger of water pollution in the plan, (2) that the ordinances did not violate the consistency provisions of the Planning Act, and (3) that the ordinances did not constitute spot zoning and would be upheld as "fairly debatable." The court reaffirmed its earlier ruling recognizing the standing of the appellant Association to challenge the zoning changes. Importantly, the court also retained jurisdiction of the action for purposes of insuring that the project would be constructed and operated in the environmentally safe manner represented by the County.

I. STANDING
At the outset, we reject the County's challenge on cross appeal to the appellant's standing. The supreme court has recently clarified the standing requirements for citizens' groups in cases like the one at bar. In Citizens Growth Management Coalition of West Palm Beach, Inc. v. City of West Palm Beach, 450 So.2d 204 (Fla. 1984), the court held that "only those persons who already have a legally recognizable right which is adversely affected have standing to challenge a land use decision on the ground that it fails to conform with the comprehensive plan." Id. at 208. The court in Citizens Growth Management upheld the trial court's finding that the Coalition had failed to prove that it or any of its members met the test. Id. The Coalition is only described as "an incorporated association the membership of which includes residents, citizens and taxpayers of West Palm Beach." Id. at 206. In our view, the Southwest Ranches Homeowners Association has a more direct stake in this matter than would a group of concerned citizens and taxpayers with a general interest in preserving the environmental character of the area. The Association is a group of property owners whose land adjoins the proposed development and stands to be directly affected by the alleged aspects of the development which are claimed to be inconsistent with the comprehensive plan; i.e. pollution, flooding, and deterioration of potable water supply. Therefore, we believe *935 that the Association meets the general standing criteria of Citizens Growth Management. Moreover, a finding of standing here is in accord with the intent of the legislature as manifested by the recent addition of Section 163.3215, Florida Statutes (1985) to the statutory scheme. This section liberalizes standing requirements and demonstrates a clear legislative policy in favor of the enforcement of comprehensive plans by persons adversely affected by local action.

II. SPOT ZONING
We also reject the Association's claim that the trial court erred in holding that the ordinances in question did not constitute illegal "spot zoning." Spot zoning is the name given to the piecemeal rezoning of small parcels of land to a greater density, leading to disharmony with the surrounding area. See Dade County v. Inversiones Rafamar, S.A., 360 So.2d 1130, 1133 (Fla. 3d DCA 1978). Spot zoning is usually thought of as giving preferential treatment to one parcel at the expense of the zoning scheme as a whole. See Allapattah Community Ass'n, Inc. of Florida v. City of Miami, 379 So.2d 387, 394 (Fla. 3d DCA 1980). Moreover, the term is generally applied to the rezoning of only one or a few lots. Cf. Allapattah, 379 So.2d at 395 n. 9. The ordinances in question do not give preferential treatment to one group of property owners in the area over another. Nor is the pattern of development in the area such that its character will be destroyed by the waste disposal facility. The site in question is not completely surrounded by low density rural uses; rather, it will be adjoined by the prison on its eastern edge. More importantly, perhaps, the BCI site is 588 acres in size, substantially larger than a few lots.

III. CONSISTENCY UNDER THE PLANNING ACT
A more difficult issue is whether the zoning changes violated the consistency provisions of the Local Government Comprehensive Planning and Land Development Regulation Act, Section 163.3161, et seq., Florida Statutes (1985), and thus constituted an invalid exercise of the County's discretionary land use authority. Under the Planning Act, municipalities and counties within the state are vested with the power and responsibility to adopt comprehensive land use plans to guide future development and growth. § 163.3167(1). Once a comprehensive plan has been adopted in conformity with the guidelines set out in the Act, all future development undertaken by responsible governing bodies is required to be "consistent" with the plan. § 163.3194(1).
Initially, we reject the County's assertion that the land use element of its comprehensive plan alone should be considered in determining consistency. The County charter mandated the adoption of a land use plan, which later became the land use element of the comprehensive plan. The other elements of the plan were adopted pursuant to the statutory mandate of Chapter 163. We cannot agree that the land use plan is the sole, controlling document with which subsequent plan elements had to comply. On the contrary, each subsequently adopted element was designed to fulfill the overall requirements and goals of the statute, as the text of these elements amply demonstrates. We find no conflict between the charter powers of the County and the statutorily mandated obligation to adopt a comprehensive plan and abide by all its elements.
Having decided that land use decisions in Broward County must be consistent with the whole of the comprehensive plan, we must next address the appropriate standard of review of local zoning decisions that are alleged to be inconsistent with the plan. The County urges in this appeal that zoning lies within the discretionary authority of local government and must be upheld if found to be "fairly debatable." Florida has traditionally applied the deferential "fairly debatable" rule in reviewing the zoning decisions of local government bodies. See, e.g., City of St. Petersburg v. Aikin, 217 So.2d 315 (Fla. 1968); City of *936 Miami Beach v. Lachman, 71 So.2d 148 (Fla. 1953) (en banc); S.A. Healy Company v. Town of Highland Beach, 355 So.2d 813 (Fla. 4th DCA 1978); Rural New Town, Inc. v. Palm Beach County, 315 So.2d 478 (Fla. 4th DCA 1975). However, we believe the enactment of the comprehensive statutory scheme manifests a clear legislative intent to mandate intelligent, uniform growth management throughout the state in accord with the statutory scheme.[1] This purpose cannot be achieved without meaningful judicial review in lawsuits brought under the Planning Act. The County notes correctly that some courts have applied the "fairly debatable" rule in Planning Act cases. See, e.g., City of Jacksonville Beach v. Grubbs, 461 So.2d 160 (Fla. 1st DCA 1984). Grubbs upheld as fairly debatable a decision by the City Council of Jacksonville Beach to deny a request to change the zoning on a piece of property from single family residential to duplex residential. Id. at 163. However, the court also held that the denial of rezoning was consistent with the comprehensive plan, which proposed that the property would eventually be available for multi-family use. Id. at 162-63. Our reading of the analysis in Grubbs, with which we agree, is that zoning decisions should not only meet the traditional fairly debatable standard, but should also be consistent with the comprehensive plan. Moreover, we note that the circumstances in Grubbs and the other cases cited by the County are distinguishable in that they involve zoning at a level less intense than that envisioned by the comprehensive plan. As the court in Grubbs noted, the purpose of a comprehensive plan is to set general guidelines for future development, and not necessarily to accomplish immediate land use changes. Id.; see also § 163.3161. Where the zoning authority approves a use more intensive than that proposed by the plan, the long term expectations for growth under the plan have been exceeded, and the decision must be subject to stricter scrutiny than the fairly debatable standard contemplates. Id. at 163 n. 3. In our view, such stricter scrutiny should be applied to the ordinances involved here, which allow a more intense use of an area than was originally contemplated by the County's land use plan.
Unfortunately, few Florida decisions address the meaning of the term "consistency" in the statute, or provide guidance as to the proper application of the term to a given set of facts. In his concurring opinion in City of Cape Canaveral v. Mosher, 467 So.2d 468 (Fla. 5th DCA 1985), relied upon by the Association, Judge Cowart advocated strict adherence to the plan. In his view, all zoning changes which depart from the parameters of the plan with respect to density should be deemed inconsistent with the plan and invalid. According to Judge Cowart, this fairly rigid approach is necessary to "make individual zoning changes, which are essentially executive action, conform to a legislated plan." 467 So.2d at 471. The changing needs of an area should be accommodated by amending the plan itself and not by enacting inconsistent provisions whenever a need arises. Id. We believe the legislative scheme calls for a more flexible approach to the determination of consistency.
The relevant statutory definition of "consistency" is contained in section 163.3194(3), which, as recently amended, provides:
(3)(a) A development order or land development regulation shall be consistent with the comprehensive plan if the land uses, densities or intensities, and other aspects of development permitted by *937 such order or regulation are compatible with and further the objectives, policies, land uses, and densities or intensities in the comprehensive plan and if it meets all other criteria enumerated by the local government.
(b) A development approved or undertaken by a local government shall be consistent with the comprehensive plan if the land uses, densities or intensities, capacity or size, timing, and other aspects of the development are compatible with and further the objectives, policies, land uses, and densities or intensities in the comprehensive plan and if it meets all other criteria enumerated by the local government.
Sections 163.3194(4)(a)-(b) of the Act permit the court to consider a broad range of factors in determining consistency with a comprehensive plan:
A court, in reviewing local government action on development regulations under this act, may consider, among other things, the reasonableness of the comprehensive plan, or element or elements thereof, relating to the issue justiciably raised or the appropriateness and completeness of the comprehensive plan, or elements or elements thereof, in relation to the governmental action or development regulation under consideration. The court may consider the relationship of the comprehensive plan, or element or elements thereof, to the governmental action taken or the development regulation involved in litigation, but private property shall not be taken without due process of law and the payment of just compensation.
It is the intent of this act that the comprehensive plan set general guidelines and principles concerning its purposes and contents and that this act shall be construed broadly to accomplish its stated purposes and objectives.
It is this latter provision in particular that we believe evidences the legislature's intent that local governments be given some flexibility in applying the plans.
Broward County's comprehensive plan consists of a land use element, originally adopted in 1977 and subsequently amended, which designates the types of uses contemplated in a specific geographic area, as well as a number of broader elements and goals which were added to the scheme as developed. The BCI site is located in an area designated in the land use element as "agricultural." In accordance with the norms set out in the agricultural designation, the area of the BCI site was zoned in the A-1 (limited agricultural) district. The agricultural designation is intended to promote agriculture-related uses and contains land use guidelines consistent with that goal, including cultivation, ranches, nurseries, etc. Residential uses are limited to one unit per acre, and neighborhood support business and retail facilities are similarly limited. Utilities, along with transportation and communication facilities, are specifically permitted within agricultural areas.
The plan also contains a solid waste element, the stated goals of which are:
1. To provide for the collection, processing and disposal of solid waste by the most efficient and effective means that satisfy health and environmental standards.
2. To eventually make a transition in solid waste disposal practices from land disposal systems to methods that emphasize the recovery of materials and generation of energy from solid waste.
The element provides a detailed set of site selection criteria for landfills. According to this element, the chosen site must "safeguard against water pollution originating from the disposal of solid waste." Landfills are specifically prohibited in a number of areas based on the proximity of the site to a public water supply. The BCI site is not in a prohibited area.
The coastal zone protection conservation element of the plan provides guidelines for the preservation of water resources. This element states that land use decisions should be consistent with protection of areas with high acquifer recharge capacity, *938 and that the extent of landfill should be limited in water recharge/storage areas. It also states a policy to protect wetland areas of sufficient size to maintain a productive biological and hydrological system.
The potable water element provides that the environmental impact of all future growth should be closely scrutinized to preclude unnecessary degradation of the area's water resources. William Pitt, author of the text of the potable water element, testified for the County that the general area of the BCI site is an unlikely area for public wellfield development based on existing poor water quality which is below federal standards for public water facilities.
Taking all the relevant considerations into account, we can find no basis for setting aside the trial court's conclusion that the proposed ordinances are consistent with the overall provisions and purposes of the comprehensive plan. First, with respect to Ordinance 84-87, which merely effected a text change for the A-6 District, we find no inherent inconsistency. This ordinance altered the permissible dimensions of waste disposal facilities within the district, a subject not directly addressed by the comprehensive plan. As the Association's expert witness conceded, this ordinance "in and of itself" does not violate any aspect of the plan.
The Association's real challenge is to Ordinance 84-35(Z), which allowed the uses set out in the A-6 text, as amended, to apply to a particular parcel of property. In examining this issue, we believe the factual findings of the trial court should be accorded great weight. The final judgment states:
Plaintiff's chief concern is that the construction and maintenance by defendant of a landfill and resource recovery facility will pollute the drinking water of the people who reside nearest to the proposed landfill and, very significantly, the residents and employees of the Broward Correctional Institute.
At the trial, defendant presented testimony of experts who testified at length regarding the proposed state-of-the-art landfill which would incorporate two synthetic liners, a leachate collection system with dykes and a storm water management system. There will be vector control with daily six inch covering as required by law.
In the main, the court sees no inherent danger of pollution if defendant's plan is properly constructed and  most significantly, if the landfill and resource recovery facility is assiduously monitored. Accordingly it is
ADJUDGED that plaintiff's prayers for injunctive and other relief are hereby denied. However, the court will retain jurisdiction of this action to enter such future orders as may be appropriate. As a serious caveat the court notes that it will, forthwith, shut down the entire operation and enjoin its future use if the proposed facility develops a "glitch" which threatens to pollute the drinking water relied upon by the home-owner members of the plaintiff association or by the residents and employees of the Broward Correctional Institute.
(Footnote omitted.) Most important is the court's finding that the Association did not prove its claim that hazardous water and other environmental pollution would result from the facility. If in fact the danger of pollution is minimal, as the trial court found, then the Association's central argument that the ordinances are inconsistent with the protection and management of water resources loses much of its force. The Association is essentially asking this court to reweigh the voluminous technical evidence on which the lower court based its findings.
The Association also contends that the proposed waste disposal facility will be incompatible with the low-intensity agricultural character of the surrounding environment. While there may be some truth in this statement, we note that the proposed use by the County, while being more "intensive" than previous zoning allowed, does not involve a higher population density *939 of use. Rather, as is indicated by the symbols utilized, rezoning from A-1 to A-6 involved approval of a more intense use within the same agricultural (A) zoning category. In fact, the County went to great lengths to demonstrate the "parklike" appearance that the site would have during and after its contemplated use for waste disposal. The area in question is already the location of a high-density use, the Broward Correctional Institution. Certainly, the prison facility could also be seen as incompatible with the norms set forth in the agricultural designation of the comprehensive plan. While we do not believe that one inconsistent use justifies another, we do believe this factor weakens the Association's contention that the area cannot support isolated high-intensity uses without losing its essentially agricultural character. In addition, utilities are already permitted in the agricultural areas and the BCI site is not in an area where landfills are expressly forbidden.
The presence of the prison facility in this area illustrates another factor demonstrating a need for flexibility. The County conceded below that it arrived at this location in a lightly settled unincorporated part of the County largely because it had experienced resistance from the residents of municipalities opposed to placing a waste disposal site in their neighborhoods. We agree with the appellant that zoning decisions should be made on the basis of rational planning goals and not political pressure. We also believe, however, that the County was entitled to consider the proximity of a particular site to large population centers as a relevant factor in the decisionmaking process. Common sense tells us that few persons will want a prison or a waste disposal facility in their neighborhoods. Government, however, is saddled with the reality that some provision must be made for such facilities. Offending the fewest people may appear to be a cop-out, especially to the "fewest," but that does not change the fact that prisons, waste disposal facilities and other indispensable components of our infrastructure must be located somewhere. This fact, while certainly not providing the County with a blank check, distinguishes such facilities from nearly every other form of residential or commercial development and constitutes, in our view, a valid additional consideration to the overall determination of consistency.
We agree with the County that managing growth under a comprehensive plan with such a wide array of elements may involve selecting between conflicting goals and priorities. This case presents a classic example. There can be no question that the legislature regards the Biscayne Aquifer, which underlies the land in question, to be a crucial environmental resource; see section 163.3177(6)(c), providing that this area "shall be given special consideration when the local government is engaged in zoning or considering future land use for said designated areas." However, we are satisfied that the trial court properly found that these concerns are protected under the County's planned use of the property, and that the ordinances are consistent with other important objectives of the plan, such as providing for more efficient solid waste disposal, and maintaining an adequate level of services for County residents. We also approve of the trial court's action in retaining jurisdiction as an additional protective device to ensure the project's development as represented in court. Obviously, waste, if not disposed of in a proper manner, constitutes a substantial threat to the environment and public health. While it may appear that we have come a long way from the time when sewage was indiscriminately dumped in our waterways and piled on our lands, legitimate concerns continue and must be addressed on an ongoing basis. The record reflects the County's near exhaustion of available waste disposal facilities, an immediate need for the project in question, and an absence of any ultimate weapon against waste accumulation and its effects.
Therefore, we conclude that the trial court did not err in finding that Ordinance 84-87 was a permissible exercise of the *940 County's authority, and that the reclassification of the property by Ordinance 84-35(Z) was not fatally inconsistent with the environmental elements of the Broward County Comprehensive Plan, or with the water management provisions of Chapter 163 which are reflected in the plan.
DOWNEY, J., and WILLIS, BEN C., Associate Judge (Retired), concur.
NOTES
[1] In a recent New York Times article, Professor Charles Haar noted some of the results of our traditional reliance on local zoning power:

[Z]oning has not dealt adequately with regional problems. This is not an inherent aspect of zoning but a political reality. Although it is the states that legally authorize local communities to zone, local communities and their residents view zoning as a strictly local power. Because of such parochialism, opportunities for intelligent regional solutions to planning problems have been missed.
Haar and Kayden, Zoning Laws Reflect Our Values and Priorities, N.Y. Times, Nov. 24, 1986, at 17, col. 1.