# Third District Court of Appeal

## State of Florida

Opinion filed April 27, 2016.

————————————

No. 3D14-2935
Lower Tribunal No. 12-351

————————————

**Errol Alvey, et al.,**
Petitioners,

vs.

**City of North Miami Beach, et al.,**
Respondents.

A Writ of Certiorari to the Circuit Court for Miami-Dade County, Appellate Division, John Schlesinger, Abby Cynamon, and Andrea R. Wolfson, Judges.

Law Offices of Charles M. Baron, P.A., and Charles M. Baron, for petitioners.

Coker & Feiner, and Rod A. Feiner (Ft. Lauderdale); Jose Smith, City Attorney, and Patricia Leigh McMillan Minoux, Assistant City Attorney, for respondents.

Before ROTHENBERG, LAGOA, and SCALES, JJ.

**CORRECTED OPINION**

ROTHENBERG, J.

We withdraw this Court's opinion dated December 16, 2015 and substitute the following corrected opinion in its stead.

In this second-tier certiorari proceeding, Errol Alvey, Charles M. Baron, Shelly Clay, and Robert Taylor ("the petitioners") seek review and quashal of the decision of the circuit court entered in its appellate capacity, denying their petition for writ of certiorari to quash the resolution passed by the Mayor and City Council of the City of North Miami Beach ("the City"). The resolution grants Braha Dixie, LLC's ("the developer") application to rezone its real property from CF, Community Facility, and RM-23, Residential Mid-Rise Multi-Family, to B-2, General Business. The developer seeks this zoning change to erect a hotel with two ten-story buildings and an 87,700 square foot six-story office building with 25,600 square feet of ground floor retail space and a four-story, 600-space parking garage.

Although we recognize that the scope of second-tier certiorari review is extremely limited, see Custer Med. Ctr. v. United Auto. Ins. Co., 62 So. 3d 1086, 1092 (Fla. 2010), we are compelled to grant the instant petition based on the circuit court's failure to apply the correct law, resulting in a miscarriage of justice. See Auerbach v. City of Miami, 929 So. 2d 693, 694-95 (Fla. 3d DCA 2006) (granting second-tier certiorari relief from the circuit court's affirmance of the variance

2

granted by the City of Miami based on the failure of both entities to apply the correct law); see also Haines City Cmty. Dev. v. Heggs, 658 So. 2d 523, 530 (Fla. 1995) (holding that "applied the correct law" is synonymous with "observing the essential requirements of law"). As this Court has stated at least twice, "[t]he law . . . will not and cannot approve a zoning regulation or any governmental action adversely affecting the rights of others which is based on no more than the fact that those who support it have the power to work their will." Auerbach, 929 So. 2d at 695 (quoting Allapattah Cmty. Ass'n of Fla. v. City of Miami, 379 So. 2d 387, 394 (Fla. 3d DCA 1980)).

## A. The location of the subject property

The subject property sits on the west side of West Dixie Highway on the northern most boundary of the City. This area of West Dixie Highway is a two-lane roadway with a speed limit of 30 mph. In the area where this property is located, the property abutting West Dixie Highway is primarily zoned B-1, limited business, with a height restriction of two stories. The stated purpose of this B-1 zoning designation is to limit the businesses along West Dixie Highway to those "of a convenience nature" and to serve "the essential and frequent needs of adjacent residential neighborhoods." North Miami Beach City Code ("the City's Code"), Sec. 24-51(A).

There are only three pieces of property not zoned B-1 on the west side of

3

West Dixie Highway. One is the subject property, which is partially zoned RM-23, which is a high density residential zoning designation with a permitted use of residential mid-rise multi-family buildings with a three-story height restriction, and the remaining portion of the subject property is zoned CF, community facility, which also has a three-story height restriction. Prior to the developer's acquisition of the subject property, the portion zoned CF housed a one- and two-story nursing home. The second piece of property not zoned B-1 is a very large 249-acre tract of land that is directly north of and which abuts the subject property. This large tract of land is occupied by a park and golf course (the Greynolds Park & Golf Course), and along the eastern border of Greynolds Park is the Oleta River, which was used by both the Tequesta and the Seminole Indians. The third piece of property not zoned B-1 is a tract of land south of the subject property (and just south of the B-1-zoned property) which is zoned RM-23 residential. All three zoning designations, CF, RM-23, and Greynolds Park, are for uses more restrictive than the B-1 limited business zoning along the west side of West Dixie Highway.

To the west and southwest of the subject property, the zoning is RM-23 high density residential with a three-story height restriction, and farther to the west of those parcels are low density single family homes. To the south of the subject property abutting West Dixie Highway, there is a strip of land zoned B-1 limited business, and farther south it is RM-23.

4

On the east side of West Dixie Highway, south of the subject property, is another strip of land zoned B-1 limited business, and just to the south of that land is a tract of land zoned recreational open space (also more restrictive than B-1). Also on the east side of West Dixie Highway are railroad tracks bordered on both sides with green space, which is located across West Dixie Highway from the subject property and on the east side of the B-1-zoned property that lies on the east side of West Dixie Highway.

Thus, the subject property is bordered on the east by West Dixie Highway; the property to the south is zoned B-1 limited business; the property to the west is all residential, beginning with a three-story higher density designation and flowing into a low density single-family home designation; to the north is a park and golf course; and to the south the land is zoned B-1, RM-23, and recreational open space. There is no land zoned B-2 general business on the west side of West Dixie Highway. Along the eastern side of West Dixie Highway, the property is zoned B-1 limited business, and farther east are railroad tracks bordered on both sides with green space. Thus, there is no land zoned B-2 general business on the east side of West Dixie Highway either.

B. **The City's Code**

Relevant to this certiorari petition is the following section of the City's rezoning requirements and "rezoning review standards." Sec. 24-174(B)(2) of the

5

City's Code mandates that "**The proposed change would be consistent with and in scale with the established neighborhood land use pattern.**" (emphasis added) As will be detailed below, the developer failed to present any evidence, and the record reflects that the City failed to make any findings regarding section 24-174(B)(2), and, in fact, the City declined to apply this section of its Code, stating that it was premature to do so. Thus, the City failed to consider and apply its own Code.

Instead of presenting any evidence that the proposed zoning change would be "**consistent with and in scale with the established neighborhood land use pattern**," the developer presented evidence and argued that the proposed zoning change would be "**compatible**" with the general area. The City also focused on compatibility and essentially approved the rezoning request, which was a necessary prerequisite for the proposed development project, based upon its finding that it would be an economic benefit to the City.

The circuit court's order is equally defective. The circuit court made no reference to or findings as to section 24-174(B)(2), or any section of the City's code. Instead, in conclusory form and language, the circuit court found that the City's decision was based on competent substantial evidence, the essential requirements of law were met, and due process had been accorded. The circuit court, however, must have applied the wrong law because the developer presented

6

no evidence that the proposed zoning change would be consistent with and in scale with the established neighborhood land use pattern and because the City made no findings that it would be consistent with and in scale with the established land use pattern and specifically refused to consider section 24-174(B)(2); nor could the City have considered it because the only evidence presented on this requirement was totally adverse.

Thus, we are not reweighing the evidence—which we cannot do. The City failed to apply its own city code and found that the proposed zoning change would be "compatible" and economically beneficial to the City, and the circuit court departed from the essential requirements of the law by finding that there was competent substantial evidence to support the City's improper standard for review when considering a proposed zoning change.

## C. **The approval process**

The subject property was zoned residential on its south end and community facility on its north end. After purchasing the property, the developer applied for a small-scale amendment to the Future Land Use Map ("FLUM Amendment") and for a rezoning of the property. Although the City's Planning and Zoning Board recommended against the FLUM Amendment, the City approved the FLUM Amendment and proceeded to consideration of the developer's rezoning application.

7

The first step with respect to the rezoning application was consideration by the City's Planning and Zoning Board. The application requested that the subject property be rezoned to B-2, which is a general business designation. Unlike the properties bordering West Dixie Highway in that area, which are zoned B-1 limited business, with a two-story height restriction, a B-2 designation would permit a height of fifteen stories. Also, whereas section 24-51(A) of the City's Code states that the intent of the B-1 zoning designation is to provide "office, retail and service uses of a convenience nature, which satisfy the essential and frequent needs of adjacent residential neighborhoods," section 24-52(A) of the City's Code provides that the intent of its B-2 zoning designation is for "development of retail and service commercial uses of a general nature which serve the diverse consumer needs of the entire community." Thus, whereas the B-1 zoning designation provides for suitable sites for development of local businesses that cater to the needs of the surrounding residents, the B-2 zoning designation serves the business needs of the entire City. The B-2 zoning designation, therefore, is much broader. It permits uses not permitted in a B-1 zoning district and includes conditional permitted uses such as bars, lounges, package liquor stores, hotels and motels, and parking garages. See N. Miami Beach, Fla., Code § 24-52(C).

The City's Planning and Zoning Board voted 5-1 against the proposed rezoning application and recommended denial of the rezoning application. The

8

developer's application then proceeded to the City's Zoning Code's required two readings. Although the City's Planning and Zoning Board recommended denial, and the developer made no presentation whatsoever at the first reading conducted on March 20, 2012, the City voted in favor of the rezoning application without any comment and without addressing its Code.

The second reading occurred on June 5, 2012. The petitioners and several more residents living next to or near the subject property appeared at this meeting and spoke in opposition of the developer's B-2 rezoning application. Generally, the objectors had no objection to a rezoning of the property to B-1, which limits the type of businesses and services that can operate on the property and carries a two-story height restriction, but they were unanimously opposed to the proposed B-2 rezoning designation, which would allow for construction up to fifteen stories and for uses inconsistent and incompatible with this residential neighborhood bordered by B-1 neighborhood businesses. Like the first reading, the developer made no presentation at the second reading, and the City voted to table the application for further consideration.

The third and final reading was on September 4, 2012. At this reading, the developer presented two experts: (1) Peter Gallo, a professional engineer; and (2) Joaquin Vargas, a traffic engineer. Charles M. Baron, representing the objecting homeowners, presented many live witnesses who voiced their objections to the

proposed B-2 rezoning application, plus fifty letters written by affected homeowners who likewise objected. At the conclusion of this hearing, the City unanimously approved the developer's B-2 rezoning application.

## D. **The evidence presented**

At the final reading held on September 4, 2012, Mr. Baron made opening remarks, and he was followed by a host of objecting residents. The main objections and concerns were: (1) the height of the buildings permitted with a B-2 designation (15 stories); (2) the height of the proposed buildings for this project (10 stories); (3) the types of uses permitted with a B-2 general business designation; (4) the nature of the project being proposed, which would infuse a large number of people from outside of the neighborhood into this residential neighborhood; (5) the traffic that this project, consisting of two ten-story hotel buildings and the six-story office and retail business building with a four-story parking garage, would add to this already congested two-lane, 30 mph roadway; and (6) the impact, visually and otherwise, to Greynolds Park.

Next, the developer's attorney, Rod Feiner, presented his opening remarks, and then he called the developer's experts, Peter Gallo and Joaquin Vargas, to testify. Their testimonies were brief and will be summarized below.

Mr. Gallo, a professional engineer, who was admitted in prior similar proceedings as an expert in planning and engineering, testified that he performed a

10

"**compatibility**" study of the area, which he identified as the Biscayne Boulevard corridor, and that the proposed project was "**compatible** with the other business areas located along **Biscayne Boulevard**."

Mr. Vargas is a registered traffic engineer. His testimony was based on his review of a traffic study performed two years prior to the hearing and he admitted that the study considered the traffic conditions along Biscayne Boulevard and that no study had been performed for traffic conditions and flow along West Dixie Highway. Based on his review of this study, Mr. Vargas testified that there would not be any significant traffic impact if the rezoning application was approved.[1]

### E.  The City's vote

First to speak was Mayor Vallejo. The Mayor focused his remarks and decision on the "need to grow . . . [and] move forward," and the expected $700,000 tax revenue, jobs, and money hotel guests and customers would spend in the area if the rezoning application was approved and the proposed hotel project was built.

Councilman De Rose concurred, stating, "The only thing I can say is that this project will create jobs and increase our tax base and definitely will be better

---

[1] Although it is clear that Mr. Vargas relied solely on a two-year-old study regarding traffic conditions on Biscayne Boulevard (an eight-lane commercial roadway) as opposed to a current study of West Dixie Highway (a two-lane 30 mph roadway), because we are not permitted to reweigh the evidence presented, we do not address or consider the sufficiency of this evidence.

than what we have now." Councilwoman Smith noted that the City was in a financial hole and the proposed project was a way to climb out of that hole—that it was "desperately needed to fulfill our obligation[s]." Councilwoman Kramer agreed with Councilwoman Smith that the City needed "to progress," and Councilwoman Martell stated that it would be nice to have a ballroom where weddings and conferences could be held in the City, and that the proposed hotel would provide that amenity.

After these comments, the City unanimously approved the developer's rezoning application.

**ANALYSIS**

Section 24-174(B)(2) of the City's zoning code mandates that, before the City may grant a rezoning request, it must find that "[t]he proposed change would be consistent with and in scale with the established neighborhood land use pattern." Because the City made no such finding and there was absolutely no evidence presented that "[t]he proposed change would be consistent with and in scale with the established neighborhood land use pattern," we grant the petition.

Glaringly omitted from this record is any consideration of Section 24-174(B)(2) of the City's code. The only evidence presented by the developer was that the proposed zoning change would be "compatible" with the Biscayne Boulevard corridor. That finding is clearly supported by the record. The Biscayne

Boulevard corridor is completely zoned B-2 or higher, as it is an eight-lane highly commercial business district. B-2 zoning would, therefore, be "compatible" with the zoning along Biscayne Boulevard. However, the subject property is not located along the Biscayne Boulevard corridor and "compatibility" is not the standard. Even the City Planner, Mr. Heid, who is in favor of the rezoning and the project, admitted that to refer to this project as being along the Biscayne Boulevard corridor was "a bit of a reach . . . I see it personally as a West Dixie Highway corridor." And the City Code requires not compatibility, but rather that the rezoning change be consistent with and in scale with the established neighborhood land use pattern. The established land use pattern along the West Dixie Highway corridor is residential, parks, recreational open space, and B-1 limited business.

It is not as though the City and the circuit court appellate panel were not put on notice as to the standard that must be applied before a rezoning application may be approved by the City. Mr. Baron, on behalf of the objectors, objected to the expert testimony as insufficient as a matter of law. Specifically, he noted that the developer failed to present any evidence that the proposed zoning amendment would comply with the City's code, that compatibility was not the required standard, and that the subject property was not located along the Biscayne Boulevard corridor, which was the only area was considered by the experts. However, in response, the City Attorney stated:

13

> What I would say is this is not the point of a hearing for a site plan approval. Until a site plan is brought forward, this argument is premature.

This was clearly error and conclusively demonstrates that the City failed to apply the correct law when voting on the proposed rezoning amendment, and that the circuit court departed from the essential requirements of the law by affirming the City's decision.

In addition to the developer's failure to present any evidence that a rezoning of the subject property would be consistent with and in scale with the established neighborhood land use pattern and the City Attorney's misadvice regarding the applicable law, the record is completely devoid of any suggestion that the City even considered Section 24-174(B)(2) of the City's code. Not one council member or the Mayor ever addressed the City's code requirements. As a group, they spoke only of the financial benefits to the City if the proposed project would be built—not whether adding a B-2 general business district to an area zoned residential, parks, recreational open space, and B-1 (limited business with a two-story height restriction) would be consistent with and in scale with the land use pattern along the West Dixie Highway corridor.

"[T]hose who own property and live in a residential area have a legitimate and protectable interest in the preservation of the character of their neighborhood which may not be infringed by an unreasonable or arbitrary act of their

government." <u>Allapattah Cmty. Ass'n</u>, 379 So. 2d at 392. Zoning ordinances are enacted to protect citizens from losing their economic investment or the comfort and enjoyment of their homes by the encroachment of commercial development by an unreasonable or arbitrary act of their government. <u>Id.</u> Thus, the burden is upon the landowner who is seeking a rezoning, special exception, conditional use permit, variance, site plan approval, etc. to demonstrate that his petition or application complies with the reasonable procedural requirements of the applicable ordinance and that the use sought is consistent with the applicable comprehensive zoning plan. <u>Bd. of Cnty. Comm'rs of Brevard Co. v. Snyder</u>, 627 So. 2d 469, 472 (Fla. 1993). Because rezoning actions have an impact on a limited number of persons or property owners, and the decision is contingent on facts arrived at from distinct alternatives by applying, rather than setting policy, the nature of the proceeding is quasi-judicial subject to strict scrutiny on certiorari review. <u>Snyder</u>, 667 So. 2d at 474-75.

## CONCLUSION

We conclude that the circuit court appellate panel departed from the essential requirements of law by failing to apply the correct law—the City's Code, Section 24-174(B)(2)—in its first tier certiorari review of the City's rezoning decision. Section 24-174(B)(2) requires the submission of evidence and a finding by the City that the proposed zoning amendment would be consistent with and in

15

scale with the established neighborhood land use pattern. Because there was no evidence presented regarding this requirement and the City made no such finding, nor could it without the submission of such evidence, the circuit court's review of the City's rezoning decision departed from the essential requirements of law because, like the City, the circuit court failed entirely to consider, much less apply, the essential provision of the City's zoning code. We, therefore, grant the petition and quash the circuit court's decision affirming City Resolution R 2012-9.

Petition granted.