795 So.2d 191 (2001)
PINECREST LAKES, INC.; and Villas at Pinecrest Lakes Limited Partnership, Appellants,
v.
Karen SHIDEL, Appellee.
No. 4D99-2641.
District Court of Appeal of Florida, Fourth District.
September 26, 2001.
*192 Jack J. Aiello and Ernest A. Cox, III, of Gunster, Yoakley, Valdes-Fauli & Stewart, P.A., West Palm Beach, for appellants.
*193 Richard Grosso, General Counsel, Environmental & Land Use Law Center, Fort Lauderdale, for appellee.
Stephen H. Grimes and Lawrence E. Sellers, Jr. of Holland & Knight, LLP., Tallahassee, for Amici Curiae, National Association of Home Builders, Florida Home Builders Association, Florida Association of Realtors, and Association of Florida Community Developers, Inc.
Michael L. Rosen, Tallahassee, for Amicus Curiae, Florida Legal Foundation, Inc.
Terrell K. Arline, Legal Director, Tallahassee, Thomas G. Pelham, Kenneth J. Goldberg and Douglas W. Ackerman, Tallahassee, for Amici Curiae, The Florida Chapter of the American Planning Association, and 1000 Friends of Florida, Inc.
FARMER, J.
The ultimate issue raised in this case is unprecedented in Florida. The question is whether a trial court has the authority to order the complete demolition and removal of several multi-story buildings because the buildings are inconsistent with the County's comprehensive land use plan. We conclude that the court is so empowered and affirm the decision under review.
Some twenty years ago, a developer[1] purchased a 500-acre parcel of land in Martin County and set out to develop it in phases. Development there is governed by the Martin County Comprehensive Plan (the Comprehensive Plan).[2] Phase One of the property was designated under the Comprehensive Plan as "Residential Estate," meaning single-family homes on individual lots with a maximum density of 2 units per acre (UPA). The Comprehensive Plan provides that
"[w]here single family structures comprise the dominant structure type within these areas, new development of undeveloped abutting lands shall be required to include compatible structure types of land immediately adjacent to existing single family development." [e.s.]
Phases One through Nine were developed as single-family homes on individual lots in very low densities.
The subject of this litigation, Phase Ten, is a 21-acre parcel between Phase One and Jensen Beach Boulevard, a divided highway designated both as "major" and "arterial." Phase Ten was designated by the Comprehensive Plan as "Medium Density Residential" with a maximum of 8 UPA. The developer sought approval of three different site plans before finally erecting the buildings that are the subject of this litigation. In 1988, the developer first sought approval for an initial scheme of 3-story apartment buildings with a density of just under 8 UPA. Karen Shidel, since 1986 an owner of a single-family residence in the adjoining area of Phase One, along with other residents, opposed the project proposed by the developer. This initial site plan for Phase Ten was approved by the County but never acted upon.
*194 Five years later the developer changed the proposed scheme to single family residences, and the County Commission approved a revised site plan for 29 single-family homes with a density of 1.37 UPA. Two years after that, however, the developer again changed its mind and returned to its original concept of multi-family structures. This time, the developer sought to develop 136 units in two-story buildings, with a density of 6.5 UPA. The County's growth management staff recommended that the County Commission approve this second revised site plan for Phase Ten. Following a hearing at which a number of people objected to the proposal, including Shidel, the County Commission approved the revision and issued a Development Order[3] for Phase Ten permitting the construction of 19 two-story buildings.
Claiming statutory authority, Shidel and another Phase One homeowner, one Charles Brooks, along with the Homeowners Associations for Phases One through Nine, then filed a verified complaint with the Martin County Commission challenging the consistency of the Development Order with the Comprehensive Plan, requesting rescission of the Development Order.[4] In response to the verified complaint, after a hearing the County Commission confirmed its previous decision to issue the Development Order.
Shidel and Brooks then filed a civil action in the Circuit Court against Martin County under the same statutory authority.[5] They alleged that the Development Order was inconsistent with the Comprehensive Plan. The developer intervened. Shidel and Brooks argued that their statutory challenge was a de novo proceeding in which the court should decide in the first instance whether the Development Order was consistent with the Comprehensive Plan. Martin County and the developer argued that the proceeding was in the nature of appellate review in which the County's determination was entitled to deference and the court should consider only whether there was substantial competent evidence supporting the Development Order. Basing its decision solely on a review of the record created before the County Commission, the trial court found that the Development Order was consistent with the Comprehensive Plan and entered final judgment in favor of the developer.
*195 At that point, the developer took stock of its position. It had prevailed before the County Commission andat least initially in the trial court. Technically, however, its approval for the project was not final. Developer considered whether to proceed to construct the buildings or instead await appellate review of the trial court's decision. Ultimately the developer decided to commence construction, notwithstanding the pendency of an appeal. Accordingly, it applied for and received building permits for construction of Buildings 8, 9, 10, 11 and 12, and started on each of those buildings while the case was under consideration in court.[6] When construction was just beginning, Shidel and Brooks sent written notice to the developer of their intention, should they prove successful in court, to seek demolition and removal of any construction undertaken while judicial consideration of the consistency issue was pending.
Appellate review did not produce the outcome for which the developer had hoped. In 1997 we reversed the trial court's decision that the County's consistency determination complied with the Comprehensive Plan. Poulos v. Martin County, 700 So.2d 163 (Fla. 4th DCA 1997). Specifically, we concluded that section 163.3215 required de novo consideration in the trial court on the consistency issue. Our opinion explained:
"if section 163.3215 was intended to provide for the circuit court to conduct an appellate review by certiorari, then the statutory language permitting the filing of the action up to 90 days after the granting of the development order is in conflict with the 30 day deadline outlined under the Florida Rules of Appellate Procedure."
700 So.2d at 165. We further adopted an analysis by Judge Wentworth as to the meaning of section 163.3215:
"the ... language in the statute ... provides only for a suit or action clearly contemplating an evidentiary hearing before the court to determine the consistency issue on its merits in the light of the proceedings below but not confined to the matters of record in such proceedings."
700 So.2d at 166 (quoting from Gregory v. City of Alachua, 553 So.2d 206, 211 (Fla. 1st DCA 1989) (Wentworth, J., dissenting)). We remanded the case for a trial de novo and for any appropriate relief.
On remand, the trial judge[7] proceeded in two stages: the first stage involved a determination whether the Development Order was consistent with the Comprehensive Plan; and the second stage, which became necessary, addressed the remedy. While the case was pending on remand, developer continued with construction. The County conducted final inspections of Building 11 and 12, issuing certificates of occupancy (CO), and residents moved into the buildings. At the end of the consistency phase, the trial court entered a partial judgment finding that the Development Order was not consistent with the Comprehensive Plan. The trial de novo then proceeded to the remedy.
At the conclusion of the remedy phase, the trial court entered a Final Judgment. The court found that the Comprehensive Plan established a hierarchy of land uses, paying deference to lower density residential uses and providing protection to those areas. The "tiering policy" required that, *196 for structures immediately adjacent to each other, any new structures to be added to the area must be both comparable and compatible to those already built and occupied.[8] The court then found significant differences between the northern tier of Phase One and the adjacent southern tier of Phase Ten. The structures in Phase One were single level, single family residences, while the structures in Phase Ten were two-story apartment buildings with eight residential units. Therefore, the court found, the 8-residential unit, two-story, apartment buildings in Phase Ten were not compatible or comparable types of dwelling units with the single family, single level residences in Phase One; nor were they of comparable density. Consequently, the court determined, the Development Order was inconsistent with the Comprehensive Plan.
As regards the remedy, the Final Judgment found no evidence indicating that either Brooks or the Homeowners Association were damaged by any diminution in value. The court found that the Homeowners Association was not a person within the meaning of section 163.3215(2) and therefore had no standing to seek relief under section 163.3215. Accordingly, only plaintiff Shidel was entitled to seek injunctive relief under section 163.3215.
In granting such relief, the court found that the developer had acted in bad faith. Specifically, the court found that the developer continued construction during the pendency of the prior appeal and continued to build and lease during the trial even after losing on the consistency issue. The court found that the developer "acted at [its] own peril in doing precisely what this lawsuit sought to prevent and now [is] subject to the power of the court to compel restoration of the status prior to construction." The relief awarded was:
(1) the Court permanently enjoined Martin County from taking any further action on the subject Development Order for Phase Ten, other than to rescind it;
(2) the Court permanently enjoined developer and its successors in interest from any further development of Phase Ten under the subject Development Order; and
(3) the Court ordered developer to remove all apartment buildings from Phase Ten either through demolition or physical relocation by a date certain.
When the Final Judgment was entered, five of the eight-unit buildings had been constructed in Phase Ten (Buildings 8-12). Buildings 11 and 12 had already received their CO's, and fifteen of their sixteen units were actually occupied. Building 10 was fully completed and was awaiting final inspection as of the date the remedies stage of trial began. Buildings 8 and 9 were 50% and 66% completed, respectively, also as of that date.
Following the entry of Final Judgment, the developer filed this timely appeal and moved for a stay pending review.[9] The trial court granted a stay only as to the demolition order, allowing lessees to continue in possession of those apartments in *197 Buildings 9-12 under actual lease when the trial court entered final judgment, as well as to those leases in Building 8 in existence as of the date of filing of the notice of appeal. The developer was prohibited, however, from entering into any renewals of existing leases upon expiration of the original term or any new leases of any apartments. Upon review, we affirmed the stay order. We now explain our decision on the merits.

I. The Consistency Issue
Initially the developer argues that the trial court erred in the consistency phase by failing to accord any deference to the County Commission's interpretation of its own Comprehensive Plan when the County approved the second revised site plan and its multi-story, multi-family buildings. Conceding that the proceedings are de novo and that the Development Order is subject to "strict scrutiny" under the Comprehensive Plan as to the consistency issue, the developer nevertheless argues that the courts must bow to the County's interpretation of its own Comprehensive Plan and the application of its many elements to the site plan. Developer argues that the statutes and cases accord such deference to a local government's interpretation of its own Comprehensive Plan and that it was reversible error for the trial court in this case to fail to do so. In particular, developer relies on Southwest Ranches Homeowners Ass'n v. Broward County, 502 So.2d 931 (Fla. 4th DCA 1987), and B.B. McCormick & Sons, Inc. v. City of Jacksonville, 559 So.2d 252 (Fla. 1st DCA 1990). According to developer, these cases authorize the use of the highly deferential "fairly debatable" standard of reviewcustomary with zoning decisions to land use determinations such as the issue of consistency in this case. We disagree.
As we have already seen in this dispute, the applicable statute provides that:
"[a]ny aggrieved or adversely affected party may maintain an action for injunctive or other relief against any local government to prevent such local government from taking any action on a development order ... which materially alters the use or density or intensity of use on a particular piece of property that is not consistent with the comprehensive plan...."
§ 163.3215(1), Fla. Stat. (2000). This statute obviously creates an action for an injunction against the enforcement of a development order, rather than to carry out such an order. The statute is aimed at development orderswhich, by their very nature, must have been approved by a local governmentso it is clear that the Legislature did not mean that local governments or developers would be the parties seeking injunctive relief under this provision.
Moreover there is but one basis for issuing the injunction: that the development order is not consistent with the Comprehensive Plan to the detriment of adjoining property owners. Hence the issuance of an injunction under section 163.3215(1) necessarily requires the judge to determine in the first instance whether a development order is consistent with the Comprehensive Plan. When a statute authorizes a citizen to bring an action to enjoin official conduct that is made improper by the statute, and that same statute necessitates a determination by the judge in the action as to whether the official's conduct was improper under the statute, as a general matter the requirement for a determination of the propriety of the official action should not be understood as requiring the court to defer to the official whose conduct is being judged. While the *198 Legislature could nevertheless possibly have some reason to require judges to require some deference to the officials whose conduct was thus put in issue, we would certainly expect to see such a requirement of deference spelled out in the statute with unmistakable clarity. Here it is not a question of any lack of clarity; the statute is utterly silent on the notion of deference. It is thus apparent that the structure and text of the statute do not impliedly involve any deference to the decision of the county officials. So we necessarily presume none was intended.[10]
Section 163.3194 requires that all development conform to the approved Comprehensive Plan, and that development orders be consistent with that Plan.[11] The statute is framed as a rule, a command to cities and counties that they must comply with their own Comprehensive Plans after they have been approved by the State. The statute does not say that local governments shall have some discretion as to whether a proposed development should be consistent with the Comprehensive Plan. Consistency with a Comprehensive Plan is therefore not a discretionary matter. When the Legislature wants to give an agency discretion and then for the courts to defer to such discretion, it knows how to say that. Here it has not. We thus reject the developer's contention that the trial court erred in failing to defer to the County's interpretation of its own comprehensive plan.
Before we proceed to assess the trial court's determination on the consistency issue, we pause to consider the history of the land development statutes. The State of Florida did not assert meaningful formal control over the explosive and unplanned development of land in this state until the passage of the first growth management statute, the Local Government Comprehensive Planning Act of 1975. Chapter 75-257, Laws of Fla. (the 1975 Act). The 1975 Act forced counties and cities to adopt comprehensive plans, but *199 they were left to interpret such plans for themselves, largely free from effective oversight by the state. See, e.g., City of Jacksonville Beach v. Grubbs, 461 So.2d 160, 163 (Fla. 1st DCA 1984) (determination of when to conform more restrictive zoning ordinances with Comprehensive Plan is legislative judgment to be made by local governing body, subject only to limited judicial review for patent arbitrariness). The requirement of adopting a Comprehensive Plan was, therefore, only a small step. Moreover nothing in the legislation required local governments to comply with their own Comprehensive Plans or that all development be consistent with the Plan.
By the early 1980's it was widely recognized that the 1975 Act was proving ineffectual in regulating Florida's development. See Reid Ewing, Florida's Growth Management Learning Curve, 19 VA. ENVT'L. L.J. 375 (2000). The lack of state control over interpretation of the Comprehensive Plan was often cited as a serious deficiency. As one such criticism described the situation:
"[f]rustration grew at the state level as well. Lacking the actual power to approve or disapprove local planning decisions, state and regional planners could not effectively coordinate and oversee local planning and regulation. Local governments changed their plans `willynilly virtually every time a city council or county commission met ...'"
John M. DeGrove, State and Regional Planning and Regulatory Activity: The Florida Experience and Lessons for Other Jurisdictions, C390 ALI-ABA 397, 428 (1994).
For another thing, the 1975 Act was criticized for failing to give affected property owners and citizen groups standing to challenge the land development decisions of local governments on the grounds that they were inconsistent with the Comprehensive Plan. The standing issue was considered in Citizens Growth Management Coalition of West Palm Beach Inc. v. City of West Palm Beach, 450 So.2d 204 (Fla. 1984) (CGMC). CGMC involved a challenge by a citizens group to a local decision to allow the construction of a large scale residential and commercial complex. The court began by referring to Renard v. Dade County, 261 So.2d 832 (Fla.1972), holding that standing to challenge local development decisions was limited to the highly deferential "fairly debatable" standard. Affected property owners in the vicinity of new development had no standing to seek enforcement of local comprehensive plans unless they could "prove special damages different in kind from that suffered by the community as a whole." 261 So.2d at 834. The CGMC court determined that the 1975 Act did not change these rules on standing. 450 So.2d at 208. The court reasoned that because the 1975 Act "did not specifically address the question" of standing, the statute was not meant to alter the common law standing requirements set forth in Renard. 450 So.2d at 206-07.
Again, to return to the criticism, this limitation on standing to enforce local planning laws resulted in:
"a failure to conform development decisions to the plan based upon the fact that citizens lacked standing to challenge development orders for lack of consistency with the comprehensive plan."
James C. Nicholas & Ruth L. Steiner, Growth Management and Smart Growth in Florida, 35 WAKE FOREST L.REV. 645, 657 (2000)(quoting Daniel W. O'Connell, Growth Management in Florida: Will State and Local Governments Get Their Acts Together?, FLORIDA ENVT'L & URBAN ISSUES, 1-5 (June 1984)). If affected property owners in the area of newly permitted *200 development could not challenge a project on the grounds that it would be inconsistent with the Comprehensive Plan, that eliminated the only real check on local government compliancea challenge by those most directly affected by a proposed development.
The growing pressure for a fundamental change in the growth management law is reflected in the following statement made just prior to the Legislature's adoption of the current law in 1985:
"In response to this lack of citizen standing, a citizen initiative began last year and thousands of signatures were collected around the state to bring the standing issue to a referendum vote. The petition specifically calls for a referendum on the issues of giving citizens a right in the state constitution to environmental health and welfare and providing them with legal standing to sue if government at the local, regional, or state level is not doing its job.
"That initiative fell just a few thousand signatures short of the required number for qualifying for a referendum in 1984. However, the initiative is continuing, and I feel confident that the issue will be brought to the voters of the state in 1985 unless the legislature addresses the issue more effectively than it did last year."
Kathleen Shea Abrams, An Environmental Word, 1 J. LAND USE & ENVT'L LAW 155, 159 (1985). Clearly the pressure from a "civically militant electorate" was growing, and the elected representatives took notice of it. The result was the Growth Management Act of 1985. Chap. 85-55, Laws of Fla. This is essentially the statute we have today, parts of which have been cited in preceding paragraphs.[12] Its most important provision for our purposes was section 163.3215, the provision used by Shidel to bring this action into court.
In Southwest Ranches, we observed that section 163.3215 had liberalized standing requirements and demonstrated "a clear legislative policy in favor of the enforcement of comprehensive plans by persons adversely affected by local action." 502 So.2d at 935. In Parker v. Leon County, 627 So.2d 476, 480 (Fla.1993), the court held that "the legislature enacted section 163.3215 to ensure the standing for any person who `will suffer an adverse effect to an interest protected ... by the ... comprehensive plan.'" 627 So.2d at 479. The Parker court quoted with approval the above passage from Southwest Ranches. 627 So.2d at 479. See also Putnam County Envt'l Council, Inc. v. Board of County Comm'rs of Putnam County, 757 So.2d 590, 593 (Fla. 5th DCA 2000) ("That standard changed, however, with the 1985 adoption of section 163.3215, which liberalized the standing requirements and `demonstrat[ed] a clear legislative policy in favor of the enforcement of comprehensive plans by persons adversely affected by local action.'"). Thus, the criticism described above certainly was of great influence in the 1985 Legislature's formulation of the new standing provision. Affected citizens have been given a significantly enhanced standing to challenge the consistency of development decisions with the Comprehensive Plan.
The Growth Management Act of 1985 was discussed in what is now recognized as the most significant land use decision by the supreme court in the past decade, namely Board of County Commissioners of Brevard County v. Snyder, 627 So.2d 469 (Fla.1993). Snyder involved a parcel then zoned only for single family homes and a proposed development of 5-6 units. The proposal also necessarily required a *201 change of zoning. After substantial opposition, and in spite of a favorable staff recommendation, the County voted to deny the request without giving any reasons. Certiorari was denied in the circuit court, one judge dissenting. The Fifth District held that rezoning actions entailing the application of a general rule or policy to specific individuals, interests, or activities are quasi-judicial in nature and should be subjected to a stricter standard of judicial review. The court found that the proposed site plan was consistent with the Comprehensive Plan, that there was no evidence supporting the denial of any necessary rezoning, and that the denial of the request without giving any reasons was arbitrary and unreasonable.
After granting review, the supreme court was first concerned with the level of review given by the courts to such proceedings. The county took the position that it had been faced with primarily a legislative judgment because the landowner sought rezoning. As the court noted:
"Both federal and state courts adopted a highly deferential standard of judicial review early in the history of local zoning. In Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926), the United States Supreme Court held that `[i]f the validity of the legislative classification for zoning purposes be fairly debatable, the legislative judgment must be allowed to control.' This Court expressly adopted the fairly debatable principle in City of Miami Beach v. Ocean & Inland Co., 147 Fla. 480, 3 So.2d 364 (1941)." [c.o.]
627 So.2d at 472. The court went on to note, however, that this tolerant form of judicial review had not proved satisfactory:
"Inhibited only by the loose judicial scrutiny afforded by the fairly debatable rule, local zoning systems developed in a markedly inconsistent manner. Many land use experts and practitioners have been critical of the local zoning system. Richard Babcock deplored the effect of `neighborhoodism' and rank political influence on the local decision-making process. Richard F. Babcock, The Zoning Game (1966). Mandelker and Tarlock recently stated that `zoning decisions are too often ad hoc, sloppy and self-serving decisions with well-defined adverse consequences without off-setting benefits.' Daniel R. Mandelker and A. Dan Tarlock, Shifting the Presumption of Constitutionality in Land-Use Law, 24 URB. LAW. 1, 2 (1992)."
627 So.2d at 472-73.
The court explained that in Florida the 1975 Act "was substantially strengthened by the Growth Management Act [of 1985]." 627 So.2d at 473. After analyzing various provisions of the Growth Management Act of 1985, the court stated:
"We also agree with the court below that the review is subject to strict scrutiny. In practical effect, the review by strict scrutiny in zoning cases appears to be the same as that given in the review of other quasi-judicial decisions. See Lee County v. Sunbelt Equities, II, Ltd. Partnership, 619 So.2d 996 (Fla. 2d DCA 1993) (The term `strict scrutiny' arises from the necessity of strict compliance with comprehensive plan.). This term as used in the review of land use decisions must be distinguished from the type of strict scrutiny review afforded in some constitutional cases. Compare Snyder v. Board of County Comm'rs, 595 So.2d 65, 75-76 (Fla. 5th DCA 1991) (land use), and Machado v. Musgrove 519 So.2d 629, 632 (Fla. 3d DCA 1987), review denied, 529 So.2d 693 (Fla.1988), and review denied, 529 So.2d 694 (Fla.1988) (land use), with In re Estate of Greenberg, 390 So.2d 40, 42-43 (Fla.1980) (general discussion of strict *202 scrutiny review in context of fundamental rights), appeal dismissed, 450 U.S. 961, 101 S.Ct. 1475, 67 L.Ed.2d 610 (1981), Florida High Sch. Activities Ass'n v. Thomas, 434 So.2d 306 (Fla. 1983) (equal protection), and Department of Revenue v. Magazine Publishers of America, Inc., 604 So.2d 459 (Fla. 1992) (First Amendment)." [e.s.]
627 So.2d at 475.
In the foregoing quotation the supreme court drew a distinction between the use of strict scrutiny in land use cases and its use in other contexts. The court approved the analyses of the Fifth District in Snyder and the Third District in Machado v. Musgrove, 519 So.2d 629, 632 (Fla. 3d DCA 1987), review denied, 529 So.2d 693 (Fla.), review denied, 529 So.2d 694 (Fla.1988), regarding land use decisions. These courts explained that strict scrutiny of local government development orders is necessary to insure that the local governments comply with the duty imposed by section 163.3194 to make decisions consistent with the Comprehensive Plan. In discussing the difference between a developer aggrieved by a land use decision of local government and an affected property owner in the vicinity aggrieved by a proposed new development, the Snyder court emphasized that section 163.3215 "provides a remedy for third parties to challenge the consistency of development orders." 627 So.2d at 475.
As one pair of writers put it, "Snyder changed the rules of the game for local government land use approvals." John W. Howell & David J. Russ, Planning v. Zoning: Snyder Decision Changes Rezoning Standards, FLA. B.J., May 1994, at 16. And another pair noted:
"The easygoing `fairly debatable' test for site-specific rezonings was abandoned and the `strict scrutiny' standard was adopted for the review of development orders under a county's comprehensive master plan."
Lucia A. Dougherty & Elliot H. Scherker, Rights, Remedies, and Ratiocination: Toward a Cohesive Approach to Appellate Review of Land Use Orders After Board of County Commissioners v. Snyder, 24 STET. L.REV. 311, 312 (1995). In light of this history, deferential review of the kind advocated by developer here is no longer the rule after Snyder.
Under section 163.3215 citizen enforcement is the primary tool for insuring consistency of development decisions with the Comprehensive Plan. Deference by the courtsespecially of the kind argued by the developer in this casewould not only be inconsistent with the text and structure of the statute, but it would ignore the very reasons for adopting the legislation in the first place. When an affected property owner in the area of a newly allowed development brings a consistency challenge to a development order, a cause of actionas it werefor compliance with the Comprehensive Plan is presented to the court, in which the judge is required to pay deference only to the facts in the case and the applicable law. In light of the text of section 163.3215 and the foregoing history, we reject the developer's contention that the trial court erred in failing to defer to the County's interpretation of its own Comprehensive Plan.
Having thus decided that the trial court was correct in failing to accord any particular deference to the Martin County Commission in its interpretation of the Comprehensive Plan, we now proceed to consider the court's determination on the consistency issue. The trial court explained its decision as follows:
"The primary claim by [plaintiffs] is that the juxtaposition of multi-story, multi-family apartments in Phase 10 directly next to the single family homes in *203 Phase 1 violates a number of provisions in the Comprehensive Plan. The provision of the Comprehensive Plan that is central to their argument is section 4-5(A)(2)(b), known as the `tiering policy.' [see n. 6, above]
"The tiering policy was added to the Comprehensive Plan ... to address how development would be added to existing single-family residential communities. There was a concern ... over how existing single-family homes were being impacted by new, adjacent denser developments....
"The tiering policy required ... a transition zone along the southern portion of Phase 10 equal to `the depth of the first block of single-family lots' within the northern portion of Phase 1. The section requires that development in the first tier of Phase 10 be limited to construction `of comparable density and compatible dwelling unit types.' The court finds that the appropriate measure is 225 feet, using the shortest average depth method of computation.
"No transition zone was established for Phase 10. The buildings along the first tier of Phase 10 are multi-family, multi-story, and have balconies. The southern tier of Phase 10 has a density of 6.6[UPA]. The overall density of Phase 10 is 6.5[UPA]. There is no meaningful difference in density across the entire western portion of Phase 10. The northern tier of Phase 1, on the other hand, is comprised entirely of single-family homes on 0.75 acre to 1.2 acre lots, with a density of 0.94[UPA].[13]
"There was no first tier transition zone established for Phase 10 as mandated by section 4-5(A)(2)(b). That section is not the only provision of the Comprehensive Plan that mandated compatible structures within the first tier of Phase 10. Section 4-4(M)(1)(e)(2) provided:
... Where single family structures comprise the dominant structure type within [residential estate densities (RE-0.5A) ], new development on undeveloped abutting lands shall be required to include compatible structure types of lands immediately adjacent to existing family development.
... Phase 1 is designated RE-0.5A
. . .
"It is impossible ... to examine the photographs of the homes in the northern tier of Phase 1, and the apartment buildings in the southern tier of Phase 10, and find that they are either `compatible dwelling unit types' or `compatible structure types.' The only residential structure that could be less compatible with the northern tier of Phase 1, would be a multi-story condominium building. There is no compatibility between the structures in the southern tier of Phase 10 and the northern tier of Phase 1. Further, an examination of the density of development in the two tiers at issue, precludes this court from finding that they are in any way comparable.
. . .
"[B]uffering does not grant relief to the [developer] under section 4-4(I)(5). That section deals with buffering between `incompatible land uses.' The more specific Tiering Policy mandates compatibility. More importantly, even to the extent that the Comprehensive Plan might, in some instances, provide a *204 builder with the ability to buffer changes in density, intensity or uses, the language of sections 4-4(M)(1)(e)(2) and 4-5(A)(2)(b) simply do not permit the type of development that is under construction in Phase 10."
. . .
"Based on the foregoing, the Court finds that the Development Order is inconsistent with the Comprehensive Plan. It is not compatible with, nor does it further the objective, policies, land uses, densities and intensities in the Comprehensive Plan. § 163.3194(3)(a)." [e.o.]
We have carefully reviewed the record of the trial and the evidence presented. It is apparent that there is substantial competent evidence to support these findings. Developer argues that the court erred in its interpretation of the "tiering policy," in deeming it a mandatory requirement rather than a discretionary guide. We conclude that the trial court's construction is consistent with the plain meaning of the text of the Comprehensive Plan. See Comprehensive Plan, § 4-5(A)(2)(b) ("a density transition zone of comparable density and compatible dwelling unit types shall be established in the new project for a depth from the shared property line that is equivalent to the depth of the first tier of the adjoining development's lower density (i.e. the depth of the first block of single-family lots)."). Moreover, given the evidence as to Martin County's adoption of the tiering policy, the record clearly supports the finding that the policy was intended to be applied in all instances of projects abutting single-family residential areas. We therefore affirm the finding of inconsistency and proceed to explain our decision on the remedy.

II. Remedy of Demolition
Developer challenges what it terms the "enormity and extremity of the injunctive remedy imposed by the trial court." It argues that the trial court's order requiring the demolition of 5 multi-family residential buildings is the most radical remedy ever mandated by a Florida court because of an inconsistency with a Comprehensive Plan. Specifically, the contention is that the trial judge failed to balance the equities between the parties and thus ignored the evidence of a $3.3 million dollar loss the developer will suffer from the demolition of the buildings. The court failed to consider alternative remedies in damages, it argues, that would have adequately remedied any harm resulting from the construction of structures inconsistent with the Comprehensive Plan. Developer maintains that the trial court erroneously failed to give meaningful consideration to the traditional elements for the imposition of injunctive relief. It contends that the trial court proceeded on an erroneous conclusion that where an injunction is sought on the basis of a statutory violation, no proof is required as to the traditional elements for an injunction.
Traditionally, as the trial judge noted, it is true that injunctions are usually denied where the party seeking such relief fails to demonstrate a clear legal right, a particular harm for which there is no adequate remedy at law, and that considerations of the public interest would support the injunction. See, e.g., St Lucie County v. St. Lucie Village, 603 So.2d 1289, 1292 (Fla. 4th DCA 1992). These are, of course, the necessary ingredients for equitable relief when we labor in the interplay of common law and equity, where ordinary legal remedies are unavailing.
Nonetheless, as between the State legislature and the several counties, the Legislature is the dominant creator of public *205 duties and citizen rights.[14] Recognizing that the Legislature has the sole power to create such public duties and citizen rights, it logically follows that the Legislature is necessarily endowed with the authority to specify precisely what remedies shall be used by judges to enforce a statutory dutyregardless of whether in general usage such a remedy usually requires additional factors before it is traditionally employed.
When the Legislature creates a public duty and a corresponding right in its citizens to enforce the duty it has created, and provides explicitly that the remedy of vindication shall be an injunction, the Legislature has not thereby encroached on judicial powers, as the courts held in Harvey v. Wittenberg, 384 So.2d 940 (Fla. 3rd DCA 1980), and Times Publishing Co. v. Williams, 222 So.2d 470 (Fla. 2d DCA 1969). The Times Publishing court explained its theory of encroachment thus:
"Injunctive relief is an extraordinary remedy which issues only when justice requires and there is not adequate remedy at law, and when there is a real and imminent danger of irreparable injury. Statutory authority for such writs, as in the act before us, are not uncommon; but it must be remembered that such writs are in the first instance judicial writs. If such statutes purport to give the circuit courts injunctive power they are ineffectual, since those courts are otherwise vested with such powers under the constitution, § 6(3) Art. V Constitution of Florida; and if they purport to dictate to such courts when, how or under what conditions injunctions should issue they would constitute an unlawful legislative infringement on a judicial function." [e.s.]
222 So.2d at 476. Times Publishing and Harvey both held that the Legislature is limited to specifying certain harms as irreparable, but the court alone has the discretion to determine whether the injunction should otherwise issue. We disagree with this analysis.
We think that is too wooden a construction of legislative powers where a statute is concededly valid. In our view when the Legislature provides for an injunction in these circumstances, it has deliberately made the new public duty and its corresponding right of enforcement an integrated statutory prescription. By specifying that the public interest requires that a certain duty be vindicated in the courts and not primarily within other branches of government, the Legislature is well within its powers. Surely the Legislature's primary role in defining public policy under the constitution is broad enough to enable it to specify a legal remedy in an enactment, regardless of whether the traditional judicial restrictions on that remedy in other, non-statutory contexts would limit its usage. As the author of the primary duty, the Legislature alone shapes the form of its effectuating mechanism.
In section 163.3215, we think the Legislature has constructed such a statute. The statute leads off with a declaration that:
"Any aggrieved or adversely affected party may maintain an action for injunctive or other relief against any local government to prevent such local government from taking any action on a development order, as defined in s. 163.3164, which materially alters the use or density or intensity of use on a particular piece of property that is not consistent *206 with the comprehensive plan adopted under this part."
From the plain and obvious meaning of this text we discern only two elements to the granting of an injunction against the enforcement of a development order: (a) the party is affected or aggrieved by (b) an approved project that is inconsistent with the Comprehensive Plan. In short, the existence of an affected neighbor is all that is necessary for the issuance of an injunction against a proposed land use that is inconsistent with the Comprehensive Plan.
We note that the statute does not say that the affected/aggrieved party bringing the action "creates a presumption of irreparable injury" by showing an inconsistency with the Plan. See, e.g., § 542.335(1)(j), Fla. Stat. (2000) ("The violation of an enforceable restrictive covenant creates a presumption of irreparable injury to the person seeking enforcement of a restrictive covenant."). When the Legislature wants to make a lesser intrusion on traditional equitable jurisdiction, it obviously knows how to do so. Here the statutory text makes the injunction the first and preferred remedy to alleviate the affects of in inconsistent land use. Hence, we read the statute to make the injunction the presumed remedy where the conditions prescribed are shown.[15]
We disagree with the developer's contention that this statute was meant to create mere discretion in the court to issue an injunction. If injunctive relief is the specified, primary remedy to correct a violation of a public duty and to vindicate the right of a person affected by the violation of that duty, it can properly be deemed a rule that the Legislature has created, not a grant of discretion. Here the Legislature has devised an entire statutory scheme to insure that all counties have a Comprehensive Plan for the development of land within their respective jurisdictions. The scheme creates mandatory duties to have a plan, mandatory duties to have the plan approved by the state, and once approved mandatory duties to limit all developments so that they are consistent with the plan's requirements. At the end of all these *207 mandatory dutiesall these shallscomes a new relaxation of the requirements on standing for citizen suits to enforce comprehensive land use plans and providing for the issuance of injunctions when an inconsistency affects another land owner. Judicial construction of that sole remedy as discretionary strikes us as remarkably inconsistent with not only the text of the statute itself but also with the purpose of the entire legislative scheme.
Developer lays great stress on the size of the monetary loss that it claims it will suffer from demolition, as opposed to the much smaller diminution in value that the affected property owner bringing this action may have suffered. It contends that a $3.3 million loss far outweighs the evidence of diminution in the value of Shidel's property, less than $26,000. Its primary contention here is that the trial judge erred in failing to weigh these equities in its favor and deny any remedy of demolition. Instead, as developer sees it, the court should have awarded money damages to eliminate the objector's diminution in value. Developer argued that it should be allowed instead of demolition it should also be allowed to build environmental barriers, green areas of trees and shrubbery, between the apartment buildings and the adjoining area of single family homes.
Developer emphasizes that we deal here with an expensive development: "a high quality, upscale project;" "forty units of high-quality garden apartments;" "five upscale multi-family dwellings, housing 40 garden apartments, at a value of approximately $3 million." Developer concedes that there is evidence showing that plaintiff Shidel's property is diminished by $26,000. It also concedes that the total diminution for all the homes bordering its project is just under $300,000. Developer contends, however, that the real countervailing harm to all these affected property owners in the vicinity is not any diminution in the value of their homes, but instead is merely "knowing that there is an upscale apartment building approximately a football field away, partially visible through some trees behind the house."
Section 163.3215 says nothing about weighing these specific equities before granting an injunction. If the Legislature had intended that injunctive enforcement of comprehensive plans in the courts be limited to cases where such imbalances of equities were not present, we assume that it would have said so. As important, such balancing if applied generally would lead to substantial non-compliance with comprehensive plans. We doubt that there will be many instances where the cost of the newly allowed construction will be less than any diminution resulting from an inconsistency. Entire projects of the kind permitted here will frequently far exceed the monetary harms caused to individual neighbors affected by the inconsistency. In other words, if balancing the equitiesthat is, weighing the loss suffered by the developer against the diminution in value of the objecting partywere required before demolition could be ordered, then demolition will never be ordered.
Moreover it is an argument that would allow those with financial resources to buy their way out of compliance with comprehensive plans. In all cases where the proposed use is for multiple acres and multiple buildings, the expenditures will be great. The greater will be its cost, and so will be a resulting loss from an after-the-fact demolition order. The more costly and elaborate the project, the greater will be the "imbalance in the equities." The more a developer is able to gild an inconsistency with nature's ornamentstrees, plants, flowers and their symbiotic fauna the more certain under this argument will *208 be the result that no court will enjoin an inconsistency and require its removal if already built.
In this case the alleged inequity could have been entirely avoided if developer had simply awaited the exhaustion of all legal remedies before undertaking construction. It is therefore difficult to perceive from the record any great inequity in requiring demolition. Shidel let the developer know when it was just beginning construction of the first building that she would seek demolition if the court found the project inconsistent. When developer decided to proceed with construction in spite of the absence of a final decision as to the merits of the challenge under section 163.3215, the developer was quite able to foresee that it might lose the action in court. It could not have had a reasonable expectation that its right to build what it had proposed was finally settled. It may have thought the decision to build before the consistency question was settled in court a reasonable "business decision," but that hardly makes it inequitable to enforce the rule as written.
It also seems quite inappropriate, if balancing of equities were truly required by this statute, to focus on the relatively small financial impacts suffered by those adjoining an inconsistent land use. The real countervailing equity to any monetary loss of the developer is in the flouting of the legal requirements of the Comprehensive Plan. Every citizen in the community is intangibly harmed by a failure to comply with the Comprehensive Plan, even those whose properties may not have been directly diminished in value.
We claim to be a society of laws, not of individual eccentricities in attempting to evade the rule of law. A society of law must respect law, not its evasion. If the rule of law requires land uses to meet specific standards, then allowing those who develop land to escape its requirements by spending a project out of compliance would make the standards of growth management of little real consequence. It would allow developers such as this one to build in defiance of the limits and then escape compliance by making the cost of correction too high. That would render section 163.3215 meaningless and ineffectual.
In this regard we are drawn to the views expressed in Welton v. 40 Oak Street Building. Corp., 70 F.2d 377 (7th Cir. 1934), a case of strikingly analogous facts. There the developer applied for a permit to erect a building, and proceeded to build while its neighbor objected to the edifice and sought to show that the building plans did not comply with the zoning ordinances. When the agency approved the building he sought relief in the courts, finally being victorious in the state supreme court. Ownership of the building meanwhile passed to a federal receiver, and so the objecting neighbor sought to enforce his remedy by injunctive relief in the federal court. The trial judge denied an injunction. On appeal the Court of Appeals disagreed and ordered a mandatory injunction to "rebuild" the edifice in compliance with the zoning law, explaining:
"We have earnestly endeavored to place ourselves in a position to fully appreciate appellees' argument to the effect that enforcement of a right which arises out of an effort to give light and air to metropolitan areas is an equity that is outweighed by the dollars advanced by builders of twenty story buildings in defiance of zoning ordinances. We have also endeavored to obtain appellees' viewpoint when they propose a money judgment to one who suffers small financial loss as satisfaction for violation of important ordinances enacted for the benefit of the public. In the fight for better living *209 conditions in large cities, in the contest for more light and air, more health and comfort, the scales are not well balanced if dividends to the individuals outweigh health and happiness to the community. Financial relief to appellants is not the only factor in weighing equities. There is involved that immeasurable but nevertheless vital element of respect for, and compliance with, the health ordinance of the city. The surest way to stop the erection of high buildings in defiance of zoning ordinances is to remove all possibility of gain to those who build illegally. Prevention will never be accomplished by compromise after the building is erected, or through payment of a small money judgment to some individual whose financial loss is an inconsequential item."
70 F.2d at 382-83. We agree with the Seventh Circuit that respect for law, in this case the Comprehensive Plan, trumps any "inequity" of financial loss arising from demolition.
Our understanding of section 163.3215 is thus different from equity's traditional use of its remedies. If, as we have shown, an injunction is the statutory remedy to insure consistency of development of property within the county, it does not seem to us that the kind of balancing advocated here would further that goal. In fact it would very likely lead to even more inconsistent development, particularly as to the kind of large scale project involved here with multiple buildings for multiple families. As we see it, the purpose of this statute is precisely against this kind of thinking. A clear rule is far more likely to erase the kind of legal unpredictability lamented by developer and amici.
The statute says that an affected or aggrieved party may bring an action to enjoin an inconsistent development allowed by the County under its Comprehensive Plan. The statutory rule is that if you build it, and in court it later proves inconsistent, it will have to come down. The court's injunction enforces the statutory scheme as written. The County has been ordered to comply with its own Comprehensive Plan and restrained from allowing inconsistent development; and the developer has been found to have built an inconsistent land use and has been ordered to remove it. The rule of law has prevailed.
We therefore affirm the final judgment of the trial court in all respects.
GUNTHER and GROSS, JJ., concur.
NOTES
[1] Originally the developer was Pinecrest Lakes, Inc., the entity which planned and built Phases One through Ten. In 1997, when we reversed the first appeal in this case for a trial de novo, the corporation transferred title to Phase Ten to a limited partnership known as The Villas at Pinecrest Lakes. The trial court substituted the limited partnership for the corporation as the developer. Consequently, when we use the term "developer" in this opinion, we refer either to the corporation or the limited partnership or both as the context requires.
[2] See § 163.3167(2), Fla. Stat. (2000) ("Each local government shall prepare a comprehensive plan of the type and in the manner set out in this act or shall prepare amendments to its existing comprehensive plan to conform it to the requirements of this part in the manner set out in this part.").
[3] See § 163.3164(7) and (8), Fla. Stat. (2000) ("`Development permit' includes any building permit, zoning permit, subdivision approval, rezoning, certification, special exception, variance, or any other official action of local government having the effect of permitting the development of land.... `Development order' means any order granting, denying, or granting with conditions an application for a development permit.").
[4] See § 163.3215(4), Fla. Stat. (2000) ("As a condition precedent to the institution of an action pursuant to this section, the complaining party shall first file a verified complaint with the local government whose actions are complained of, setting forth the facts upon which the complaint is based and the relief sought by the complaining party. The verified complaint shall be filed no later than 30 days after the alleged inconsistent action has been taken. The local government receiving the complaint shall respond within 30 days after receipt of the complaint. Thereafter, the complaining party may institute the action authorized in this section. However, the action shall be instituted no later than 30 days after the expiration of the 30-day period which the local government has to take appropriate action.").
[5] See § 163.3215(1), Fla. Stat. (1995) ("Any aggrieved or adversely affected party may maintain an action for injunctive or other relief against any local government to prevent such local government from taking any action on a development order ... which materially alters the use or density or intensity of use on a particular piece of property that is not consistent with the comprehensive plan adopted under this part.").
[6] We express no view on the propriety of Martin County issuing building permits while the case was pending in court.
[7] The original judge assigned to the case was rotated into another division, so the case was assigned to a new judge.
[8] "A project immediately adjacent to lands used or designated for lower intensity use should be given lesser density. (1) For that portion of said project abutting the existing development or area of lesser density, a density transition zone of comparable density and compatible dwelling unit types shall be established [e.s.] in the new project for a depth from the shared property line that is equivalent to the depth of the first tier of the adjoining development's lower density (i.e. the depth of the first block of single-family lots)." Comprehensive Plan, § 4-5(A)(2)(b).
[9] Neither Charles Brooks nor Martin County has appealed the final judgment, or filed a brief in this appeal by Karen Shidel.
[10] To illustrate the point, we draw an analogy. The action by a county approving a development order could fairly and logically be compared to the actions of administrative agencies generally. Thus we might contrast section 163.3215(1) with comparable provisions of the Administrative Procedures Act. Section 120.68 generally grants parties in agency proceedings access to a court after the agency has finally acted. Section 120.68(4), however, limits review to the record in agency. There is no similar provision in section 163.3215. Moreover section 120.68(7) spells out in precise detail exactly what the reviewing court can do. Among its provisions is the following:

"The court shall remand a case to the agency for further proceedings consistent with the court's decision or set aside agency action, as appropriate, when it finds that ... (b) The agency's action depends on any finding of fact that is not supported by competent, substantial evidence in the record of a hearing conducted pursuant to ss. 120.569 and 120.57; however, the court shall not substitute its judgment for that of the agency as to the weight of the evidence on any disputed finding of fact ... (e) the agency's exercise of discretion was: 1. outside the range of discretion delegated to the agency by law; 2. inconsistent with agency rule; 3. inconsistent with officially stated agency policy or a prior agency practice, if deviation therefrom is not explained by the agency; or 4. otherwise in violation of a constitutional or statutory provision; but the court shall not substitute its judgment for that of the agency on an issue of discretion." [e.s.]
§ 120.68(7), Fla. Stat. (2000). There is nothing even remotely comparable in section 163.3215.
[11] See § 163.3194(1)(a), Fla. Stat. (2000) ("After a comprehensive plan...has been adopted in conformity with this act, all development undertaken by, and all actions taken in regard to development orders by, governmental agencies in regard to land covered by such plan or element shall be consistent with such plan or element as adopted."). [e.s.]
[12] See supra notes 2, 3, 4 and 5 and accompanying text.
[13] At this point in the Final Judgment, the court went on to show in a comparative table that the change in density between the two tiers represented a 560% difference, the change in population a 492% difference, and the number of units a 418% difference.
[14] See Art. VIII, § 1(f) and (g), Fla. Const. (whether charter or non-charter government, Counties are granted power to enact only ordinances that are "not inconsistent with general law").
[15] We reject developer's argument that demolition is improper simply because Shidel failed to seek a temporary injunction against any construction while the case proceeded in court on the consistency issue. In the first place, when the action was filed the trial court originally thought its role limited to a record review of the proceedings before the Martin County Commission and concluded that no error had been shown. Having decided there was no error in the limited review it thought applicable, the trial court was hardly likely to grant a temporary injunction while the case was on appeal.

Even more important, however, we find nothing in the text of the relevant statutes making such a request for a temporary injunction a precondition to effective final relief after a trial de novo when the court finds that the permitted use is inconsistent with the Comprehensive Plan. We note from other statutes that when the Legislature means to place restrictions on third party challenges to agency decisions granting permits, it says so in specific text. Compare § 403.412(2)(c), Fla. Stat. (2000), with § 163.3215(4), Fla. Stat. (2000), as to preconditions for suit; see also § 163.3215(6), Fla. Stat. (2000) ("The signature of an attorney or party constitutes a certificate that he or she has read the pleading, motion, or other paper and that, to the best of his or her knowledge, information, and belief formed after reasonable inquiry, it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or for economic advantage, competitive reasons or frivolous purposes or needless increase in the cost of litigation. If a pleading, motion, or other paper is signed in violation of these requirements, the court, upon motion or its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.").